Eugene A. MECHLER, Plaintiff,

v.

CONSOLIDATED PIPE & SUPPLY CO., INC. OF MISSOURI, Defendant.

No. 78–1324C(5).

United States District Court, E. D. Missouri, E. D.

Jan. 9, 1981.

Darold E. Crotzer, Jr., Clayton, Mo., for plaintiff.

Armstrong, Teasdale, Kramer & Vaughan, Thomas E. Wack, Timothy K. Kellett, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

CAHILL, District Judge.

This matter is before the Court for a decision on the merits after a three day trial held on November 3–5, 1980. It is based on an allegation of breach of contract by plaintiff on a "Deferred Employment Compensation Agreement." The defendant denies the validity of the agreement and asserts a counterclaim of losses allegedly incurred by defendant corporation as a result of plaintiff's conduct.

## FINDINGS OF FACT

I. *Plaintiff's Complaint.*

1. Plaintiff is a citizen and resident of the State of Illinois. Defendant is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in St. Louis County, Missouri. The amount in controversy, exclusive of interest and costs, exceeds the sum of ten thousand dollars ($10,000.00).

2. The complaint in this action was filed in three counts. The Court previously sustained the motion of defendant to dismiss Counts I and II. The issues tried in this case relate to Count III of the plaintiff's complaint and to defendant's counterclaim.

3. The business of defendant is the sale of steel pipe at wholesale.

4. Plaintiff Mechler was employed by defendant as its vice president and general manager from April 30, 1973, until his termination on or about May 31, 1978. Plaintiff was also a director of defendant during the entire period of his employment and he owned about 20 percent of the outstanding stock of Consolidated Pipe. At all relevant times, W. T. Williams, Jr., was the secretary and a director of defendant corporation.

The by-laws of the defendant corporation describe the powers of the corporate secretary as follows:

"The Secretary shall: (a) keep the minutes of the shareholders' and of the Board of Directors' meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these by-laws or as required by law; (c) be custodian of the corporate records and of the seal of the corporation and see that the seal of the corporation is affixed to all certificates for shares prior to the issue thereof and to all documents, the execution of which on behalf of the corporation under its seal is duly authorized in accordance with the provisions of these by-laws; (d) keep a register of the post office address of each shareholder which shall be furnished to the Secretary by such shareholder; (e) sign with the President, or a Vice-President, certificates for shares of the corporation, the issue of which shall have been authorized by resolution of the Board of Directors; (f) have general charge of the stock transfer books of the corporation; (g) in general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to him by the President or by the Board of Directors."

5. On April 30, 1973, the shareholders of defendant were Thomas A. Kerr (280 shares), E. E. Raughley (280 shares), William J. Cornelius (120 shares), W. T. Williams, Jr. (120 shares), and Eugene A. Mechler, the plaintiff (200 shares).

6. In his capacity as vice president and general manager of defendant, plaintiff was in charge of the daily business activities and operations of Consolidated Pipe, including the execution and authorization of its contracts. The remaining officers, directors, and shareholders of defendant, including W. T. Williams, Jr., were at all relevant times located in Birmingham, Alabama, where they worked primarily for a "sister corporation" engaged in the same business as defendant.

7. On or about October 10, 1974, plaintiff had certain communications with an insurance agent who advocated that defendant purchase a "key man insurance policy" on plaintiff's life and use the cash values of that policy to fund a deferred compensation agreement for the benefit of plaintiff. Plaintiff thereafter talked to an attorney who drafted such a "deferred com-

pensation agreement" for plaintiff and delivered it to him. According to plaintiff's own version of the facts, the following events then took place:

8. Sometime in November, 1974, W. T. Williams, Jr., called plaintiff, indicated that he would be traveling through St. Louis, and would like to talk to plaintiff. Mechler made arrangements to meet Williams at the St. Louis airport. Prior to the meeting at the airport, Mechler had no discussions with Williams or anyone else about any life insurance or any deferred compensation agreement.

9. The meeting between Mechler and Williams at the airport lasted about 45 minutes. In the course of their conversation, Mechler indicated to Williams that he was acquiring a life insurance policy in which Consolidated would be the named beneficiary. Mechler also told Williams that the insurance policy would fund the deferred compensation agreement and that the company would not have to make any out-of-pocket expenditures to satisfy the terms of that agreement. Mechler did not show the life insurance policy to Williams but did take out the proposed deferred compensation agreement and asked Williams to sign it. Williams signed the agreement on the wrong line (at the place for the signature of "Executive," not the "Company"). Apparently he did not read the document before executing it. Mechler had no further conversations with Williams at any time regarding the deferred compensation agreement.

10. Following the airport meeting with Williams, Mechler took back the original and all copies of the deferred compensation agreement, and placed them in a safe. Mechler did not execute this document at that time. He did not inform any of the remaining officers, directors, or shareholders of this document.

11. While defendant's version of what occurred is drastically different from plaintiff's evidence, the Court finds that neither Mechler nor his attorney presented this document to any representative of defendant until after his termination as manager.

12. The execution of the deferred compensation agreement is not reflected in the minutes of any of the meetings of the shareholders or directors of defendant. No such deferred compensation agreement had been executed in favor of the operating head of any of the other thirteen "sister" Consolidated Pipe companies. This document and the obligations it purported to create was never reflected in any of the financial statements prepared by the defendant's outside accountants; no reserve was ever made for this item in any of the accounting statements prepared by the company's accountants. While paragraph 6 of the document provides that defendant could have elected to purchase a life insurance contract to provide the funds for payments thereunder, no such life insurance policy was acquired then or later.

## II. *Defendant's Counterclaim.*

With respect to the counterclaim filed by defendant in this cause, the Court finds:

1. During the first four months of 1978, plaintiff received, in addition to his salary, the following amounts:

| | |
|---|---|
| January, 1978 – | $2,000.00 |
| February, 1978 – | 1,000.00 |
| March, 1978 – | 1,500.00 |
| April, 1978 – | 500.00 |

Each of these payments was reported on the monthly financial statements sent to the officers, directors, and shareholders of defendant.

2. Plaintiff leased, in addition to his regularly authorized automobile, a 1974 Oldsmobile Delta 88, a 1976 Oldsmobile Delta 88, and a 1977 Oldsmobile Toronado. The payments for these leased automobiles were listed in the monthly financial reports of defendant's operations, which were available to the officers of defendant.

3. Prior to the lease which gave plaintiff the use of an additional automobile, there was a discussion between plaintiff and W. T. Williams, Jr., about the second automobile. Plaintiff told Williams that he had terminated an employee and was going to return the automobile which had been

leased for that employee. Williams suggested that plaintiff keep the automobile.

4. On or about August 14, 1979, plaintiff caused defendant to purchase a policy of insurance from Northwestern Mutual Life Insurance Company. Defendant was the owner and the beneficiary of the policy which insured the life of plaintiff and had a death benefit of $500,000.

5. The existence of the policy of insurance was made known to W. T. Williams, Jr., secretary of defendant.

6. Payments of premiums on the policy were reported to the other officers, directors, and shareholders in monthly financial reports prepared at plaintiff's direction and sent to said officers, directors, and shareholders.

7. Plaintiff, at various times during his employment by defendant, borrowed sums of money. On each occasion of said borrowing, the loan was evidenced by a promissory note. Plaintiff repaid each loan in full with interest.

8. In early 1977, plaintiff authorized a loan of $10,000 to Roy Lofton, an employee hired by defendant. The loan was for the purpose of assisting the employee in locating in the St. Louis area from Houston, Texas. The employee was terminated by plaintiff. At the time of his termination, Lofton still owed defendant $9,000 which was written off by defendant as a bad debt.

9. Defendant has alleged that plaintiff "set out upon a pattern and practice of reducing the assets and increasing the liabilities of Consolidated through various accounting devices so that he could buy the stock of Consolidated at a price more favorable to him." The Court finds that no sale of stock to plaintiff was ever consummated; therefore, defendant suffered no damage.

10. From December, 1973 through May, 1978, plaintiff caused defendant to pay certain commissions to William Roewe, an employee of Missouri Pipe Fittings Company. Certain of these commissions were paid to Roewe in exchange for Roewe allowing defendant to purchase allocations of pipe which defendant later sold to its customers

at a profit. Other commissions were paid to Roewe for the procurement of sales to Missouri Pipe Fittings Company by defendant. On each occasion of a payment of commissions to Roewe, defendant corporation derived a profit. The profit was, in each instance, equal to or greater than profit derived from similar transactions involving other customers. Roewe testified that he controlled the purchase of steel by Missouri Pipe Fittings Company and that if he had not received the commissions, Missouri Pipe Fittings Company would neither have sold pipe to defendant nor purchased pipe from defendant.

## CONCLUSIONS OF LAW

I. *Plaintiff's Complaint.*

1. As to plaintiff's complaint, the Court finds that it has jurisdiction over the subject matter of Count III and of the counterclaim of defendant. The Court also has jurisdiction over the person of the corporate defendant.

2. Defendant is entitled to judgment on the merits with respect to Count III of plaintiff's complaint for the following reasons:

(a) The corporate secretary, W. T. Williams, Jr., had no authority to execute a contract on behalf of the corporation to obligate it for the payment of money. *First Nat. Bank of Clayton v. Frisco Park Rlty. Co.*, 510 S.W.2d 59 (Mo.App.1974); *Fuller v. Tootle-Campbell Dry Goods Co.*, 189 Mo.App. 514, 176 S.W. 1091 (1915); *Parks v. Midland Ford Tractor Co.*, 416 S.W.2d 22 (Mo.App.1967).

(b) But even if the corporate secretary otherwise had the authority to execute the deferred compensation document, the failure to properly disclose certain acts which Mechler executed through his confidential and fiduciary position with the defendant abrogates any claim of contractual validity. *Ensler v. Missouri Pac. R. Co.*, 324 Mo. 530, 23 S.W.2d 1034 (1930); *Drake v. Greener*, 523 S.W.2d 601 (Mo.App.1975); *Maupin v. Missouri State Life Ins. Co.*, 214 S.W. 398 (Mo.1919).

(c) Finally, while the execution by Williams on the wrong line of the contract might ordinarily not be sufficient to prevent the formation of a contract, that fact together with the evidence adduced by defendant as set forth in the findings above indicates there was never any meeting of the minds sufficient to bind the defendant, or that there was full and proper disclosure by a fiduciary to his principle.

## II. *Defendant's Counterclaim.*

1. As to defendant's counterclaim, the Court further concludes that under the facts existing during plaintiff's employment, plaintiff had been given broad authority over the running of defendant's business. The acts and conduct of the other shareholders, directors, and officers were such as to confer general authority upon the plaintiff to set his own terms of employment so long as those terms were disclosed to Kerr and Raughley. The normal method of disclosure was by reporting to Cornelius or Williams and by submission of a monthly financial statement. Monthly financial statements were submitted by plaintiff or at his direction, which included disclosure of the pertinent expenditures complained about by defendant.

 2. With respect to the alleged unauthorized payments made to plaintiff during the first four months of 1978, the Court holds that plaintiff had the authority to authorize said payments to himself, and by prior practice had done so previously. This authority was derived from the course of conduct of all parties who were shareholders, officers, and directors, and in their implied consent to such payments.

 3. The leasing of an additional automobile by plaintiff was expressly authorized by defendant's officers. Plaintiff has no legal liability to defendant for these payments.

 4. With regard to defendant's claim that the payments made for an insurance policy on plaintiff's life are chargeable to plaintiff, the Court holds that the payments were made after they were fully disclosed to other officers, directors, and shareholders, and plaintiff has no liability therefor.

 5. With regard to defendant's claim that plaintiff unlawfully borrowed money from defendant, the Court holds that defendant was fully reimbursed by plaintiff for any loans made to plaintiff. Defendant suffered no damage and is not entitled to recover any sums as a result of these facts. The loan to Roy Lofton was an act of defendant. Plaintiff's authority extended to such transactions. It is admitted by defendant that plaintiff was authorized to run the business and to set compensation of employees, and generally enter into transactions of this nature. The fact of loss does not automatically make plaintiff liable. Defendant has not proven a breach of duty in this regard and plaintiff has no liability for this amount.

 6. Since defendant has failed to prove that it suffered any damage as a result of the alleged "pattern and practice of reducing the assets and increasing the liabilities of Consolidated . . . ," the Court holds that plaintiff has no liability to defendant for the acts and activities alleged in the counterclaim in this regard.

 7. The commission payments to William Roewe of Missouri Pipe Fittings Company did not result in a loss to defendant. Plaintiff was attempting to advance the business interests of defendant by procuring pipe during a time of shortage. The pipe purchased from Missouri Pipe Fittings Company was later sold to customers of defendant at a profit. Defendant has failed to produce any evidence which would indicate a loss to defendant on these transactions. With respect to the sales to Missouri Pipe Fittings Company, the Court holds that in view of Roewe's testimony that the sales would not have been made without the payment of commissions, defendant has the burden of proving that the profit on these sales was inadequate or that defendant suffered a loss. Defendant has not met its burden of proof. Plaintiff has

no liability in connection with commissions paid.

8. The Court finds that the plaintiff was given very broad discretion in the normal operations of the local corporation that he managed and, furthermore, that the defendant did not maintain a pattern of even casual scrutiny of the day-to-day operation of the firm. The plaintiff, admittedly a "take-charge guy," assumed duties and authority beyond the normal ken of ordinary corporate responsibility, bordering on a breach of his fiduciary relationship, but the defendant corporation and its officers, by their own casual supervision, encouraged such excursions, which could easily have been prevented by the maintenance of appropriate managerial limitations and controls.

9. Therefore, the Court finds that the losses suffered by both litigants are to a large degree self-inflicted by an over zealous plaintiff and an indolent defendant, so that the Court, by its verdict herein, shall, in essence, leave both plaintiff and defendant as it finds them, with the admonition that courts cannot undo all the mischief that occurs when knowledgeable executives and directors blatantly fail to assume their corporate responsibilities and thereafter cry for belated assistance from the judicial system.

10. Accordingly, judgment will be entered in favor of the defendant and against the plaintiff on Count III of the complaint, and in favor of plaintiff and against the defendant on defendant's counterclaim.