James L. MILLER

v.

U.S. FOODSERVICE, INC., et al.

No. CIV.A. CCB04–1129.

United States District Court,
D. Maryland.

March 23, 2005.

---

Benjamin Rosenberg, T. Christine Pham, Rosenberg Martin Funk Greenberg LLP, Paul Mark Sandler, Robert B. Levin, Shapiro Sher Guinot and Sandler, Baltimore, MD, for James L. Miller.

Andrew Gendron, G. Stewart Webb, Jr., John Burnside Howard, Jr., Venable Baetjer and Howard LLP, Baltimore, MD, for U.S. Foodservice, Inc., et al.

### MEMORANDUM

BLAKE, District Judge.

James L. Miller, former President, Chief Executive Officer, and Chairman to United States Foodservice, Inc. ("USF"), and director to its parent company, Koninklijke Ahold N.V. ("Royal Ahold"), sued his former employers, including three individual officers of Royal Ahold and the wholly-owned subsidiary Ahold U.S.A., Inc., for failing to provide him with the post-termination benefits he claims he is entitled to under his employment agreement.[1] Miller's complaint contains claims for breach of contract, including anticipatory breach of contract, fraudulent inducement, negligent misrepresentation, and promissory estoppel. He is seeking a declaratory judgment as to whether and to what extent he is entitled to benefits, as well as compensatory damages in the amount of at least $ 10 million, and a temporary restraining order and preliminary injunction ordering the companies to pay his benefits pending the outcome of this litigation.[2] Royal Ahold and USF ("the companies") countersued,[3] claiming, among other causes of action, that Miller violated the fiduciary duties of due care, good faith, and loyalty, and therefore they are not obligated to provide him with the benefits conferred by the contract. The companies also are suing under the theory of corporate waste, and are bringing contract claims for mutual mistake and unjust enrichment. They are seeking forfeiture, disgorgement, and restitution to Royal Ahold and USF of compensation, incentive-based bonuses, and other benefits, as well as rescission of the employment agreement if its enforcement would result in ill-gotten gains. Miller has moved for dismissal, or in the alternative, for summary judgment, on the grounds that Royal Ahold and USF have failed to state a claim because he is protected by the business judgment rule, or the indemnification provisions of the USF by-laws. The issues regarding Royal Ahold and USF's counterclaim have been fully briefed and no hear-

---

1. Miller originally filed suit in the Circuit Court for Baltimore County. The defendants removed the matter to the U.S. District Court for the District of Maryland, and the court denied Miller's motion to remand, holding that the Employment Retirement Income Security Act ("ERISA") preempts certain of Miller's claims. See 323 F.Supp.2d 665 (D.Md. 2004).

2. Miller's complaint included a motion for a temporary restraining order and preliminary injunction seeking reinstatement of his benefits pending outcome of this litigation. The parties reached an interim agreement and the motion for injunctive relief was terminated on November 29, 2004.

3. Ahold U.S.A., Inc., has voluntarily dismissed without prejudice its counterclaims against Miller. (See docket entry no. 23.)

ing is necessary. *See* Local Rule 105.6. For the reasons set forth below, Miller's motion to dismiss will be denied in part and granted in part.

## BACKGROUND

James Miller joined USF, a Delaware corporation engaged in the food distribution business and headquartered in Columbia, Maryland, in 1983 and rose to the position of CEO in 1994. Miller also served as USF's Chairman of the Board of Directors, President, and CEO since 1997. After Royal Ahold, an international food provider based in the Netherlands, acquired USF in 2000, Miller became a member of Royal Ahold's Executive Board (also known as its Managing Board or "RVB") on or about September 1, 2001. He served in this dual capacity as officer and director for USF and director for Royal Ahold until May 13, 2003, the day he resigned from his positions.

Miller's resignation was precipitated by an accounting scandal involving USF's income from promotional allowances, which are payments made by vendors to the company to promote their goods. In 2003, internal investigations revealed that USF "accounting irregularities" had resulted in an overstatement of USF's income by nearly $900 million for fiscal years 2000 and 2001, and during fiscal year 2002. (Countercl.¶ 6.) Consequently, Royal Ahold restated its earnings in October 2003 in the 2002 Form 20–F filed with the SEC. (Countercl.¶ 7.) The 2002 Form 20–F reported that Royal Ahold "determined that certain senior officers and other USF employees had violated generally accepted accounting principles by improperly and prematurely recognizing promotional allowances" and that "material weaknesses in USF's accounting procedures and internal controls had permitted this improper revenue recognition over the preceding three years."

(Countercl.¶ 9.) Miller avers that he had "absolutely no involvement in the purported wrongful conduct" and that the companies have treated him as a "scapegoat" for the problem (Compl.¶¶ 11, 12.) The companies contend that as President, CEO, and Chairman of USF during the relevant years, Miller had "supervisory, managerial, and oversight responsibilit[y]" for USF's operations and accounting practices, that he knew by July 2000 of material weaknesses in USF's internal controls, and that he failed to oversee correction of the known accounting deficiencies for almost three years. (Countercl.¶¶ 10–24.) The counterclaimants assert that Miller was alerted to the internal control problems by a July 24, 2000 letter from Deloitte & Touche, the company's external auditor, which stated that "deficiencies in the design and operation of [USF's] internal controls ... could adversely affect the Company's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements." (Countercl.¶ 15.) In addition, the companies assert that Miller intentionally misrepresented that corrective measures were being implemented several times during USF Audit Committee meetings in 2000 through 2002. (*See* Countercl. ¶¶ 17–21, referring to meetings on November 29, 2000, April 5, 2001, October 29, 2001, April 8, 2002, and in October and November 2002.) The companies contend they later learned that, contrary to Miller's positive assertions, "no significant progress had been made on implementing the necessary changes." (Countercl.¶ 19.)

At the request of senior Royal Ahold executives, Miller resigned from his USF and Royal Ahold positions on May 13, 2003. (Compl.¶ 13.) According to Miller, in exchange for his resignation, he was promised he would receive post-termi-

nation benefits as specified by his employment agreement with USF, a severance payment in consideration for his service with the Royal Ahold Executive Board ("RVB"), and all rights and benefits through his Ahold USA retirement plan vested through December 31, 2003. (Compl.¶ 12.) On September 29, 2003 Miller received a letter from USF (*see* Compl. ¶ 21, Ex. 7) stating that his employment would officially terminate October 1, 2003 and at that time all benefits, other than those expressly addressed in his initial employment terms letter from October 4, 2001 and the addenda attached thereto (Compl., Ex. 1), as well as the February 2, 2001 letter regarding post-termination benefits (Compl., Ex. 6), would also cease. On January 28, 2004, Miller received a letter from Royal Ahold stating that the company would terminate his post-termination benefits on February 29, 2004. (Compl.¶ 22, Ex. 8.) On February 17, 2004, Miller received a letter from Royal Ahold and USF explaining that they would continue to provide some, but not all, post-termination benefits on a voluntary basis, subject to modification for any reason that the companies deem appropriate. (Compl.¶ 22, Ex. 9.) Miller contends that Royal Ahold and USF fraudulently induced him to resign by promising these benefits, and that they materially breached

their agreement when they unilaterally ceased providing him with post-termination benefits. The companies argue that Miller materially breached his employment agreement by violating the fiduciary duties of due care, good faith, and loyalty, and therefore they are discharged from their obligations under the employment and severance agreements.

## *ANALYSIS*

### I. *Choice of Law*

Generally, the law of a corporation's state of incorporation applies to claims arising from the company's internal affairs. *Gonzalez v. Fairgale Props. Co., N.V.*, 241 F.Supp.2d 512, 516 n. 4 (D.Md.2002). USF is incorporated in Delaware, and the parties rely on Delaware law throughout their motions.[4] Likewise, because Miller's employment agreements were executed in Maryland and related to his employment in Maryland, Maryland law will apply to the companies' contract claims.[5]

### II. *Standard of Review*

Miller has moved to dismiss the companies' counterclaim or, in the alternative, for summary judgment. Miller urges the court to consider documents outside the pleadings, namely, the indemnification provisions of the USF by-laws, to dispose of

---

**4.** The counterclaimants suggest that Delaware law may apply to Royal Ahold's corporate claims as well because Miller was a "dual director" of a Delaware corporation (USF) and its parent company (Royal Ahold). The counterclaimants do not, however, rule out the possibility that Dutch law may apply to Royal Ahold's claims because it is incorporated in the Netherlands, and they specifically reserve the right to submit evidence of foreign law at a later stage if it appears to be relevant. (Memo. in Opp'n at 7, n. 4) (citing *Cremi v. Brown*, 955 F.Supp. 499, 522 (D.Md. 1997)).

**5.** Miller initially argued that Royal Ahold's counterclaim should be dismissed because it

failed to plead claims with particularity as required by Rule 9(b). This argument was premised on the belief that, under Maryland law, "bad faith" claims are akin to "fraud" claims, and therefore such claims must comply with Rule 9(b). (Pl.'s Motion to Dismiss at 10.) The defendants correctly countered that Delaware law, not Maryland law, governs the corporate claims and that under the relevant precedent, bad faith claims are distinguishable from fraud claims and therefore Rule 9(b) does not apply. (Defs.' Memo. in Opp'n at 18, citing *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197–98 (D.Del.2000).) Because Miller did not address this issue in his reply brief, the court will assume he waived his Rule 9(b) argument.

Royal Ahold and USF's claims on summary judgment. He contends that the indemnification provisions negate the companies' claims because they establish that he cannot be personally liable for acts undertaken while serving as an officer and director. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) ("The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'") Accordingly, summary judgment is generally a more appropriate standard of review once the facts have been elicited through the development of the record, whereas a motion to dismiss standard generally tests the sufficiency of the pleadings alone. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999) ("a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses") (internal quotation marks and alterations omitted). It would be premature at this stage to decide this matter on summary judgment.

First, it is possible to consider the bylaws without converting a motion to dismiss into a motion for summary judgment. *See In re Baxter Int'l Inc. Shareholders' Litig.*, 654 A.2d 1268, 1270 (Del.Ch.1995) (when reviewing whether a certificate of incorporation exempts directors from liability, "[t]he court may take judicial notice of the certificate [of incorporation] in deciding a motion to dismiss.") (citation omitted); *In re Abbott Laboratories Derivative Shareholders Litig.*, 325 F.3d 795, 810 (7th Cir.2003) (under Delaware law "when the validity of a waiver clause is not contested and where the plaintiffs allege only a breach of the duty of care, with no claims of 'bad faith, intentional misconduct, knowing violation of law, or any other conduct for which the directors may be liable,' the waiver provision may be considered and applied in deciding a motion to dismiss"). *Cf. Malpiede v. Townson*, 780 A.2d 1075, 1079 (Del.2001) (holding that although consideration of the corporate charter's indemnification provisions would normally convert a motion to dismiss into a motion for summary judgment, the lower court's failure to do so was not reversible error.)

Second, while Delaware courts have allowed dismissal of a complaint for failure to make a pre-suit demand when the pleadings alleged *solely* a violation of the fiduciary duty of care on the grounds that the claim was barred by the corporation's exculpatory provision in its charter, *see, e.g., Malpiede*, 780 A.2d at 1095–96, indemnification provisions in corporate governing documents issued pursuant to Del. Code Ann., tit. 8, § 102(b)(7) cannot be invoked to bar duty of loyalty and good faith claims.[6] *Id.* Thus, where, as here,

---

**6.** Del.Code Ann. tit. 8, § 102(b)(7) provides that a company's certificate of incorporation may include: A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct

the complaint alleges well-pleaded facts that implicate the duty of loyalty and good faith, as well as the duty of care, the indemnification provision will not subject the complaint to dismissal.[7] *See In re Abbott*, 325 F.3d at 811 ("Where the complaint sufficiently alleges a breach of fiduciary duties based on a failure of the directors to act in good faith, bad faith actions present a question of fact that cannot be determined at the pleading stage.").

For these reasons, Miller's motion will be treated as a Rule 12(b)(6) motion rather than one for summary judgment. When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Edwards*, 178 F.3d at 244. In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *See, e.g., Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir.2001) (noting that the "presence . . . of a few conclusory legal terms does

not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions); *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir.1995) (affirming Rule 12(b)(6) dismissal with prejudice because the plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law).

### III. *Standing*

 Miller initially challenged Royal Ahold and Ahold USA's standing to sue, arguing that Royal Ahold was only a shareholder of USF (and that Ahold USA was not even a shareholder) and that Royal Ahold had not followed the proper procedure to bring a derivative shareholder suit on behalf of USF.[8] Miller abandoned this argument in his reply. The defendants correctly indicate that as a director of both USF and its parent Royal Ahold, Miller owed separate fiduciary duties to each company, and therefore Royal Ahold has standing to sue for Miller's alleged breaches that directly caused Royal Ahold harm. *In re Digex*, 789 A.2d 1176, 1206 (Del.Ch.2000) ("individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations") (citation omitted). *See also Qantel Corp. v. Niemuller*, 771 F.Supp. 1361, 1367 (S.D.N.Y.1991) (explaining that a "plaintiff

---

or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

**7.** It is worth noting that USF's indemnification provision, though contained in its bylaws and not in the corporate charter or certificate of incorporation, is comparable to the corporate provisions analyzed in other cases under Delaware law. *See, e.g., McCall v. Scott*, 239 F.3d 808, 818 (6th Cir.2001). Miller argues in his reply brief that USF's provi-

sion provides greater indemnity than Delaware law, *see* Miller Reply at 10, principally because it protects for omissions as well as acts, while Delaware law speaks only of actions. This difference does not change the principle that under Delaware law, officers and directors cannot be indemnified if it is found they violated duties of good faith and loyalty.

**8.** As mentioned previously, *see supra* note 3, Ahold USA voluntarily dismissed without prejudice its counterclaims against Miller.

parent shareholder has standing to recover for [a decline in value of the parent's shares of the subsidiary] despite the fact that the subsidiary corporation may itself have a claim against the defendant for the direct injury to it").

## IV. Corporate Claims

### A. Duties of care and good faith

■ Miller argues that Royal Ahold and USF's corporate claims fail because as an officer and director of USF (and director of Royal Ahold), his actions are protected by the business judgment rule and the indemnification provisions of the USF by-laws.[9] While it may be a close issue, it would be premature to dismiss the companies' counterclaims based on either of Miller's defenses.

■ Under Delaware law, corporate officers and directors owe their corporation the fiduciary duties of due care, good faith, and loyalty. *Malone v. Brincat*, 722 A.2d 5, 10 (Del.1998). *See also 3 Fletcher Cyclopedia Corp.* § 846 ("An officer's duties appear coextensive with those of directors."). The duty of care requires that corporate officers and directors "exercise an informed business judgment" to make decisions reasonably determined to be in the best interests of the corporation and its shareholders. *Smith v. Van Gorkom*, 488 A.2d 858, 872–73 (Del.1985). *See also In re Caremark Int'l Inc. Deriv. Li-*

*tig.*, 698 A.2d 959, 968 (Del.Ch.1996) (describing the duty of care inquiry as "whether there was good faith effort to be informed and exercise judgment.") Officers and directors are protected from liability for their decisions under the rebuttable presumption of the business judgment rule, that is, "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The business judgment rule focuses on the process by which directors and officers make informed decisions, not on the substance of the decision itself. *In re Caremark*, 698 A.2d at 967–68.

While generally courts do not second-guess corporate decision-making and directors and officers enjoy the presumption of the business judgment rule, the rule can be overcome by allegations of gross negligence. *See Aronson*, 473 A.2d at 812 (Del. 1984) ("**While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence.**") There is also persuasive authority stating that the business judgment rule, with its focus on informed decision-making processes, does not apply in cases such as this one, where

9. Miller also argues that these fiduciary duties apply only to directors, and that the ultimate responsibility for any losses stemming from "dereliction of duty" rests with the board of directors, and not the corporate officers. (Miller Reply at 2.) Miller's contention is without merit. It is a fundamental principle of corporate law that the fiduciary duties of care, good faith, and loyalty apply to both corporate directors and officers. *See, e.g., Bates v. Dresser*, 251 U.S. 524, 531, 40 S.Ct. 247, 250, 64 L.Ed. 388 (1920) (holding a bank president liable for losses incurred under his watch, reasoning that: "[i]n accepting the

presidency Dresser must be taken to have contemplated responsibility for losses to the bank, whatever they were, if chargeable to his fault. Those that happened were chargeable to his fault, after he had warnings that should have led to steps that would have made fraud impossible, even though the precise form that the fraud would take hardly could have been foreseen."); *McCall v. Scott*, 239 F.3d 808 (6th Cir.2001) (reviewing claims alleging breach of fiduciary duties of care and loyalty against both directors and officers). Moreover, Miller served as a director to both corporations, not just as an officer to USF.

directors are accused of failing to act. In *Aronson,* the Supreme Court of Delaware observed in dicta that:

> **the business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.** But it also follows that under applicable principles, a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule.

473 A.2d at 813. The court then cited a number of Delaware cases alleging director liability for failure to act that were adjudicated on the concepts of business judgment, opining that "they do not in actuality present issues of business judgment." *Id.,* 813 n. 7. *See also In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d at 968 n. 16 ("The vocabulary of negligence while often employed, is not well-suited to judicial review of board attentiveness.").

More recently, in *In re Caremark Int'l,* the principal case relied upon by the counterclaimants, the Delaware Court of Chancery articulated a standard for liability based on a director's failure to act. At the outset, the court noted that director liability premised on a theory of failure to act "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," particularly when there are no allegations involving conflict of interest or suspect motivation. *Id.* at 967. In *Caremark,* the court relied on *Graham v. Allis–Chalmers Mfg. Co.,* 188 A.2d 125 (Del.1963) to hold that when a "loss eventuates not from a decision but, from unconsidered inaction" *id.* at 968, "only a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a necessary condition to liability."

*Id.* at 971. The court characterized this as a "demanding test" to meet. *Id.* In *Graham,* there were no claims that the directors knew subordinate employees were committing antitrust violations. The Delaware Supreme Court concluded that, absent any suspicions, the board could not be held liable for being unaware of the illegal activity. 188 A.2d at 130. The *Caremark* court interpreted this holding to mean that "absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." 698 A.2d at 969. The *Caremark* court cautioned, however, that corporate boards could not satisfy the *Graham* standard without

> assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.

*Id.* at 970. The court explained that "it is important that the board exercise a good faith judgment" as to whether its reporting systems are "adequate" to assure that the board could satisfy its responsibility. *Id.*

In *McCall v. Scott,* 239 F.3d 808, 818–19 (6th Cir.2001) the Sixth Circuit ruled that under the *Caremark* standard and Delaware law, a director need not have acted intentionally to harm the corporation in order to be liable for breach of the duty to exercise appropriate attention to potentially illegal corporate activities. In holding that behavior other than intentional conduct could subject a director to liability, the court reasoned that, "[t]o the extent

that recklessness involves a conscious disregard of a known risk, it could be argued that such an approach is not one taken in good faith and thus could not be liability exempted under the [§ 102(b)(7) ] statute." *Id.* at 818 (internal quotations and citation omitted).[10] *See also In re Abbott Laboratories Deriv. Shareholders Litig.,* 325 F.3d 795, 811 (7th Cir.2003) (finding that plaintiffs' allegations concerning the directors' "intentional conduct in failing to address the federal violation problems," as well as a " 'conscious disregard of known risks, which conduct, if proven, cannot have been undertaken in good faith,' " were at the pleading stage sufficient to overcome the liability waiver provision in the corporation's certificate of incorporation) (quoting *McCall v. Scott,* 250 F.3d 997, 1001 (6th Cir.2001)). In *McCall,* the shareholder plaintiffs claimed that Columbia/HCA's senior management, with board knowledge, devised schemes to improperly increase revenue and profits and cultivated a philosophy that encouraged employees to falsify financial records. In the context of assessing the pleadings to determine demand futility, the court found that the plaintiffs' allegations that directors intentionally or recklessly failed to act and disregarded red flags over an almost three year period were sufficient to state a claim. *Id.* at 824. The red flags included the failure to act in the face of questionable audit practices, aggressive acquisition practices, a *qui tam* action, federal investigations and a *New York Times* investigation. *Id.* at 820–24.

The allegations in this case do not include red flags as significant as in *McCall.* Here, the companies allege that Miller knew in July 2000 of internal control problems, and that despite his awareness of the pressing nature of the problem he failed over a period of almost three years to implement corrective measures. (Countercl.¶ ¶ 13–24.) The counterclaimants assert that this failure was particularly egregious because Mark Kaiser, the officer responsible for promotional allowance tracking and internal auditing, reported directly to Miller. The companies allege further that Miller breached his duty of good faith by intentionally misrepresenting during several USF Audit Committee meetings that stronger controls were being implemented, though later these assurances ·proved false. (Countercl.¶ ¶ 17–24.) They claim that Miller knew ineffective tracking of promotional allowances "had the potential to cause USF to overstate its income and thus to show phantom profits" and that "Miller's incentive-based compensation depended on the net profitability of USF, and Miller in fact received incentive-based bonus compensation equal to or exceeding his annual salary." (Countercl.¶ 16.) The companies claim that the gravity of Miller's offense is compounded by his dual role as President and CEO for USF and director for Royal Ahold.

While the companies' allegations do not directly suggest that Miller should have suspected wrongdoing, as the *Graham* decision requires, the *Caremark* court made it clear that the *Graham* decision should not be interpreted so broadly as to supplant the requirement that corporate directors and officers ensure an adequate information and reporting system exists. 698 A.2d at 969. The companies allege that despite early warnings, such as the July 2000 letter from Deloitte & Touche,

---

**10.** The Sixth Circuit issued a second opinion in *McCall v. Scott, see* 250 F.3d 997, on April 23, 2001. This opinion denied petitions for rehearing en banc and amended the court's earlier ruling of February 13, 2001. *See* 239 F.3d 808. The amended opinion clarified that "while it is true that duty of care claims alleging only grossly negligent conduct are precluded by a § 102(b)(7) waiver provision, it appears that duty of care claims based on reckless or intentional misconduct are not." 250 F.3d at 1000.

that USF's information and reporting system was significantly deficient, Miller failed to implement measures to correct the problem. The *Caremark* court considered it an "elementary fact that [the provision of] relevant and timely *information* is an essential predicate for satisfaction of the board's supervisory and monitoring role." *Id.* at 970. In other words, first and foremost, directors and officers must assure that a reporting system exists which is "in concept and design adequate" to provide appropriate and timely information to them so that they may satisfy their monitoring responsibility. *Id.* Therefore, questions as to whether a director had grounds to suspect wrongdoing by other officers or directors presume the existence of an adequate reporting system. *Id.* at 970 (observing that even with adequate reporting systems, "senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law.").

Perhaps the most critical support for the companies' claims that Miller breached fiduciary duties of care and good faith, however, is the allegation that Miller, for a period of almost three years, intentionally misrepresented to the USF Audit Committee (and consequently to the parent company, Royal Ahold) that the internal controls were being corrected. The counterclaim details representations made by Miller at several USF Audit Committee meetings during 2000 through 2002 that indicated corrective measures were being implemented and that strengthening the company's internal controls was a top priority. The companies describe a scenario where Miller repeatedly misled the USF Audit Committee and the parent company, Royal Ahold. For example, according to the counterclaimants, at an April 8, 2002 Audit Committee meeting, Miller "stated that USF was abandoning its prior plans to use a particular type of tracking system

because it 'was not as robust as first anticipated.' In fact, this tracking system had never been implemented at all." (Countercl.¶ 20.) If these allegations are true, they may constitute persuasive evidence that Miller acted in bad faith, thereby violating duties of both care and good faith. Additionally, Miller's dual role as director and officer (President, Chairman, and CEO of USF, director to Royal Ahold) magnifies the importance of the duties he owed and allegedly violated. Construing the allegations in the light most favorable to the counterclaimants, I find that the companies have stated claims against Miller for breach of the fiduciary duties of care and good faith. As a defendant seeking protection of the exculpatory provision in USF's by-laws, Miller bears the burden of demonstrating good faith. *McCall,* 239 F.3d at 818 n. 10 (citing *Emerald Partners v. Berlin,* 726 A.2d 1215, 1223–24 (Del. 1999)).

### B. Duty of Loyalty

The companies also have alleged that Miller violated his fiduciary duty of loyalty. Miller argues that the duty of loyalty claim fails as a matter of law because the counterclaimants have not asserted that he usurped a corporate opportunity. Miller contends that "the duty of loyalty is implicated only where there are competing economic interests," or "where there is a transaction between the corporation and one of its officers or directors...that is not substantively fair to the corporation." (Miller Reply at 5) (citing *Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A.2d 377 (Del.Ch.1999)). While it is true that most duty of loyalty cases involve situations where officers or directors usurp business opportunities or otherwise put their own pecuniary interests above those of the corporation, *see, e.g., In re Digex,* 789 A.2d 1176 (Del.Ch.2000), *Broz v. Cellular Information Systems, Inc.,* 673 A.2d 148 (Del. 1996), the general principle of a fiduciary

duty of loyalty is not limited to the corporate opportunity doctrine. The leading authority is *Guth v. Loft*, 5 A.2d 503 (Del. 1939), a corporate opportunity case widely cited for its articulation of the duty of loyalty, namely that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." 5 A.2d at 510. The *Guth* court declared that the duty of loyalty required a director or officer "to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it..." *Id.* Although the *Guth* opinion firmly established the doctrine of corporate opportunity, the court did not limit the duty of loyalty to corporate opportunity situations. The court stated that "the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents." *Id.* Specifically preserving flexibility for the rule's application, the *Guth* court also stated that "[t]he occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated." *Id.* This language demonstrates the court's view that the duty of loyalty applies to situations beyond traditional corporate opportunity cases.

■ Here, the companies rely principally on their allegation that Miller intentionally misrepresented the status of efforts to correct USF's internal controls to establish their duty of loyalty claim. They further allege that Miller's conscious disregard of known risks concerning USF's promotional allowance tracking system, and his failure to address the problem, resulted in damage to the companies when they were forced to restate USF's earnings by $900 million, and to undergo significant accounting and legal fees. These allegations, coupled with the companies' assertions that Miller knew that the promotional allowance tracking deficiencies could potentially cause USF to overstate its earnings, and that Miller in fact received incentive-based compensation equal to or exceeding his annual salary of $750,000 because of USF's overstated income, are sufficient to state a claim for breach of the fiduciary duty of loyalty. The companies' allegations suggest that Miller put his own pecuniary interests, received in the form of bonus compensation based on false profits, above those of the corporation. *See, e.g., Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (stating that a corporate officer or director must scrupulously observe the duty of loyalty and "not only [act] affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation" and the rule "requires an undivided and unselfish loyalty to the corporation," demanding "that there be no conflict between duty and self-interest") (quoting *Guth*, 5 A.2d at 510). Whether Miller violated the duty of loyalty "is a factual question to be decided by reasonable inferences from objective facts." *Guth*, 5 A.2d at 513.

## C. Corporate Waste

In addition to seeking recovery of salary and bonus compensation paid to Miller, the companies have brought a corporate waste claim against Miller to recover money for personal expenses he charged to USF. In particular, they cite $130,000 for personal expenses not covered by the employment agreement, forty-five percent of which were submitted and reimbursed without receipts; membership fees and expenses for four country clubs when his employment agreement only specified two; another $236,000 in benefits including home improvement expenses, security services, and a Mercedes S class sedan, which they also

assert were not covered by his employment agreement. (Countercl.¶ 50.)

■ Directors are only liable for corporate waste claims when they " 'authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.' " *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 362 (Del.Ch.1998), *aff'd in relevant part, Brehm v. Eisner*, 746 A.2d 244, 263 (Del.2000) (quoting *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del.Ch.1993)) (holding that the board's decision to offer a generous compensation package to attract the CEO was reasonable). Generally, courts grant broad discretion to directors in matters of executive compensation. *Id.* (citing *Haber v. Bell*, 465 A.2d 353, 359 (Del.Ch.1983)). Accordingly, "[i]f reasonable, informed minds might disagree on the question, then in order to preserve the wide domain over which knowledgeable business judgment may safely act, a reviewing court will not attempt to itself evaluate the wisdom of the bargain or the adequacy of the consideration." *Glazer*, 658 A.2d at 183 (citations omitted). Miller argues that this is such an occasion and therefore, because reasonable minds could disagree about the value of his services, the waste claim should be dismissed. He also argues that "[t]here is . . . no dispute that USF authorized and approved those expenditures without protest," and that the defendants should not be allowed to revisit the issue now that in hindsight, "they are upset about the bargain they agreed to." (Miller's Reply at 9.)

There is some limited case law suggesting that a corporate officer is not entitled to reimbursements for money spent without authority, or where the expenditure in no way benefited the corporation.[11] The corporation, however, may not be able to recover unauthorized payments where other officers and directors reviewed the payments and acquiesced in them. *See, e.g., Mechler v. Consol. Pipe & Supply Co.*, 506 F.Supp. 1139, 1144–45 (E.D.Mo.1981) (finding after a bench trial that corporation could not recover expenditures where president had apparent authority to make payments to himself, and directors and officers had consented to such payments through their course of conduct.) The *Mechler* court acknowledged that the president's actions "border[ed] on a breach of his fiduciary relationship, but the defendant corporation and its officers, by their own casual supervision, encouraged such excursions, which could easily have been prevented by the maintenance of appropriate managerial limitations and controls." *Id.* at 1145. The court refused to step in and allot compensation to either party because the "knowledgeable executives and directors blatantly fail[ed] to assume their corporate responsibilities." *Id.*

■ The facts in this case argue for a similar outcome. Despite the companies' protests, Miller's employment agreement appears to be sufficiently broad to cover many of the complained of expenses, and USF apparently reimbursed the expenses without question.[12] Given these circum-

11. *See, e.g., Interstate Investment & Dev. Co. v. Webster*, 188 Iowa 1389, 177 N.W. 554 (Iowa 1920) (president had the burden of showing the money he expended was for the benefit of the business); *Ebner v. Alaska Mildred Gold Min. Co.*, 167 F. 456 (9th Cir.1909) (requiring former president to reimburse the company for travel and entertainment expenses be-

cause there was no duty or agreement that he should do so on behalf of the corporation).

12. Section 4(b) paragraph (vi) of the employment agreement ("fringe benefits") provides that the "the Company shall, during the Employment period, pay all of the Executive's dues and membership assessments of two country clubs in the geographic vicinity of the

stances, it would be inappropriate to intervene when the companies themselves could have better managed their own agreement with Miller. Simply put, the facts alleged do not state a claim for corporate waste. The companies knowingly agreed to Miller's perquisites and it is not the role of the court to attempt to evaluate "the wisdom of the bargain or the adequacy of the consideration." *Glazer*, 658 A.2d at 183.

## V. *Contract Claims*

In addition to the corporate claims, Royal Ahold and USF have sued Miller under several contract theories, including breach of the employment agreement, mutual mistake, and unjust enrichment. The counterclaimaints are seeking forfeiture, disgorgement, and restitution of any compensation, including bonus payments and benefits paid to Miller during the relevant time, as well as rescission of the employment agreement if its enforcement would leave Miller with ill-gotten gains. To the extent that the counterclaimants have stated a claim for violation of the fiduciary duties of care, good faith, and loyalty, they also have stated a claim for breach of contract. The mutual mistake and unjust enrichment claims, however, must be dismissed for failure to state a claim.

■ If the companies succeed in showing that Miller breached the fiduciary duties of care, loyalty or good faith, then Miller may be liable for breach of his employment agreement. *See, e.g., Regal Savings Bank v. Sachs*, 352 Md. 356, 722 A.2d 377, 380 (1999) ("For the breach of duty by an employee to extinguish the obligation of the employer to pay future compensation under a contract of employment, the breach, even if willful, must be material.") (citing *St. Paul at Chase v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A.2d 12, 25 (1971), *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971)); *Maryland Credit Fin. Corp. v. Hagerty*, 216 Md. 83, 139 A.2d 230, 234 (1958). The question of materiality is one for the jury to determine. *Id.* at 382. Under Maryland law it is clear that "an agent who is guilty of fraud upon his principal, particularly where there is a conflicting interest, concealment, or a wilful and deliberate breach of his contract, may be denied compensation for his services." *Shipley v. Meadowbrook Club*, 211 Md. 142, 126 A.2d 288, 291 (1956) (finding that employee's conduct, including use of corporate assets that were later repaid, and possible conversion of a certificate of stock, did not merit application of this rule). *See also Lawson v. Baltimore Paint and Chemical Corp.*, 347 F.Supp. 967, 977 (D.Md.1972) ("Where there has been a wilful breach of [an officer or director's] duty, full recovery by the plaintiff has generally been allowed...Where, however, the conduct of the officer or director was less flagrant, and he had rendered some real service to the corporation, only a part of the compensation has been ordered returned.") (citations omitted). In *Lawson*, the court found after a bench trial that three officers and directors had wilfully breached their fiduciary duties to the corporation by orchestrating business deals that resulted in financial rewards for

Company's headquarters, and such other club memberships as are determined by the Executive and the Board to be useful in connection with the Executive's duties on behalf of the Company. The Company shall also reimburse the Executive for all reasonable expenses incurred at such club(s) on behalf of the Company." (Compl., Ex. 1.) In addition, the fringe benefits paragraph provides that

"the Executive shall be entitled to the full use of a new car..." There is also a paragraph (iii) stating that the "the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid....or which the Executive is eligible to receive..."

and that such benefits shall be known as "other benefits." *Id.*

themselves at the expense of the company, and by causing the company to incur unnecessary legal and business expenses. The court held the three officers and directors jointly and severally liable and ordered them to repay salaries, bonuses, and unwarranted company expenses and legal fees. *Id.* at 977–78. Thus, under Maryland law, it would be possible for Royal Ahold and USF to recover compensation, including bonuses and expenses, from Miller if it is established he wilfully breached fiduciary duties that were material in nature. *See also 5A Fletcher Cyclopedia of Private Corp.*, § 2145 ("A corporate officer is not entitled to compensation for services during a period in which that officer engages in activities constituting a breach of the duty of loyalty to the corporation, or willful breach of his or her contract of employment, even though part of his or her services may have been properly performed ...") (citations omitted); *Boston Children's Heart Foundation, Inc. v. Nadal–Ginard*, 73 F.3d 429, 435–36 (1st Cir. 1996) (stating that it is a "baseline proposition that a court can require a corporate officer [or] director ... to forfeit the right to retain or receive his or her compensation for conduct in violation of his or her fiduciary duties" and describing factors

courts use to determine whether an officer found to have violated his duties is entitled to any compensation for services rendered).

The companies also argue that they should be able to recover compensation paid to Miller on a theory of unjust enrichment, or in the alternative, mutual mistake. For different reasons, these claims are not sufficient, and will be dismissed.[13] In Maryland, unjust enrichment claims are viable only when an express contract does not exist between the parties. *County Com'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 747 A.2d 600, 607 (2000) (citation omitted). Courts will deviate from this rule and allow recovery based on a theory of unjust enrichment "only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter." *Id.* at 609 (citations omitted). Under these principles, the counterclaimants assert they should be able to recover on a theory of unjust enrichment after a court-ordered rescission of the contract. While the companies seek rescission of the contract

---

**13.** To support their mutual mistake claim, the companies argue that the Miller employment agreement and compensation package were premised on the perceived profitability and performance of USF, and that because these basic assumptions turned out to be false, "there was at best a mutual mistake between the parties that materially affected the agreed-upon exchange of performances." (Countercl. ¶ 47.) In Maryland, "[a]t common law recovery of money paid under a mistake of fact is limited to money paid or received under a mistake on the plaintiff's part, or a mutual mistake." *Wasena Housing Corp. v. Levay*, 188 Md. 383, 52 A.2d 903, 905 (1947). While there are few Maryland cases applying this rule, the Restatement (Second) of Contracts § 154 Comment a explains that a contracting party generally bears the risk of

mistake, and although "changes in circumstances" may "upset basic assumptions and unexpectedly affect the agreed exchange of performances," the court should not ordinarily intervene unless impracticability or frustration of purpose dictate relief. A party bears the risk of mistake when "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." *See* Restatement (Second) of Contracts § 154(b). Here, Royal Ahold and USF assumed the risk that USF's profitability could be materially different than what was expected when the parties agreed to Miller's compensation package. Accordingly, their plea for rescission of the contract because of mutual mistake fails.

based on Miller's intentional or reckless misrepresentations concerning the promotional allowance tracking system, the circumstances of this case do not warrant rescission. Court imposed rescission is an extreme remedy, appropriate only in situations where there is "well established breach of a contract, and the injury caused thereby is irreparable, or if the damages that might be awarded would be impossible or difficult to determine or inadequate." *Vincent v. Palmer,* 179 Md. 365, 19 A.2d 183, 188 (1941). Here, if it is determined that Miller wilfully and materially breached his duties, it will be possible to do an accounting for damages to Royal Ahold and USF. Moreover, equitable rescission is impracticable in this case because it is not possible for the companies to restore to Miller the services he rendered to them. *See Griggs v. E.I. DuPont de Nemours & Co.,* 385 F.3d 440, 447–49 (4th Cir.2004) (citing numerous cases explaining that, except for limited circumstances, rescission in equity is only possible where the party seeking rescission can restore to the other party what was received from him). For these reasons, the unjust enrichment claim, as well as the mutual mistake claim, will be dismissed.

## VI. *Conclusion*

Consistent with the analysis set forth above, Royal Ahold and USF have stated counterclaims for breach of the fiduciary duties of care, good faith, and loyalty, as well as breach of contract. Miller's motion to dismiss will be denied as to those claims but granted as to the mutual mistake, unjust enrichment, and corporate waste claims.

A separate Order follows.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the plaintiff's Motion to Dismiss the Counterclaim (docket entry no. 20) is **Denied** as to the claims for breach of fiduciary duties of care, good faith, and loyalty, as well as breach of contract (Counts 1, 2, and 3);

2. the plaintiff's Motion to Dismiss the Counterclaim is **Granted** as to the unjust enrichment, mutual mistake, and corporate waste claims (Counts 4, 5, and 6); and

3. copies of this Order and the accompanying Memorandum shall be sent to counsel of record; and

4. counsel shall confer and submit by **April 5, 2005,** a proposed schedule for discovery and any further motions in this case.