RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

PETROLEUM ENHANCER, LLC,
  *Plaintiff/Counterclaim Defendant-Appellee*,

  *v.*

LESTER R. WOODWARD,
                    *Defendant*,

————————————————————————

POLAR MOLECULAR CORPORATION,
        *Intervenor/Counterclaim/Third-Party
                              Plaintiff*,

POLAR MOLECULAR HOLDING CORPORATION,
        *Intervenor/Counterclaim/Third-Party
                       Plaintiff-Appellant*,

AFFILIATED INVESTMENTS, LLC, RICHARD
SOCIA, CARL HILL, BRUCE BECKER, and A.
RICHARD NELSON,
        *Third-Party Defendants-Appellees*.

> No. 11-1167

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
Nos. 1:07-cv-12425; 1:09-cv-10247—Thomas L. Ludington, District Judge.

Argued: May 30, 2012

Decided and Filed: August 10, 2012

Before: MARTIN, GILMAN, and WHITE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Russell C. Babcock, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. John B. Alfs, CLARK HILL PLC, Birmingham, Michigan, for Appellee. **ON BRIEF:** Russell C. Babcock, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. John B. Alfs, CLARK HILL PLC, Birmingham, Michigan, for Appellee.

————————————

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  Polar Molecular Holding Corporation (Polar Holding) was, at all times relevant to this lawsuit, a publicly held Delaware corporation and the sole shareholder of Polar Molecular Corporation (PMC), a company engaged in the petroleum-additive business.  In 2006, PMC was in default on a loan for which it had pledged valuable intellectual property as collateral, and Polar Holding was in the midst of an internal dispute between two members of its board of directors regarding the business strategy of PMC.  This dispute eventually caused one of those directors, Richard Socia, to form a competing company called Petroleum Enhancer (Petroleum) for the sole purpose of acquiring PMC's promissory note and collateral from the holder of PMC's loan.  Petroleum was incorporated in March 2007, Socia resigned from Polar Holding's board the following month, and Petroleum acquired PMC's promissory note shortly thereafter.

In June 2007, Petroleum brought suit in federal district court against Lester Woodward, an escrow agent in possession of PMC's collateral, alleging that PMC was in default on the payment of its promissory note.  Polar Holding and PMC intervened in the lawsuit and filed counterclaims against Petroleum and a third-party complaint against a number of additional parties, including Socia.  Both Polar Holding and PMC alleged claims of breach of fiduciary duty, civil conspiracy, and tortious interference.  After PMC filed for bankruptcy, its claims became the property of the bankruptcy trustee.  Polar Holding's claims were later dismissed on summary judgment, and it has appealed.  For the reasons set forth below, we **AFFIRM** the dismissal of Polar Holding's tortious-interference claim as addressed by the district court, but **REVERSE** the dismissal of its breach-of-fiduciary-duty claim against Socia and its civil-conspiracy claim against the individual third-party defendants, and **REMAND** the case for further proceedings on the latter two claims, as well as on Polar Holding's tortious-interference claim not addressed below.

## I. BACKGROUND

### A.     Factual background

The disagreement concerning the business strategy of PMC was between Mark Nelson, Polar Holding's President, Chief Executive Officer (CEO), and Chairman of the Board, on the one hand, and Socia, on the other. This disagreement eventually created animosity between the two, which came to a head during a January 26, 2007 board meeting of Polar Holding. Both Nelson and Socia were present at the meeting, as were Polar Holding's three other directors, two of whom were Walter Fay and Robert MacKenzie.

The meeting, which had been called by Socia, opened with Socia attempting to remove Nelson from his positions as President, CEO, and Chairman. But Socia's motion for removal did not pass, and Nelson then responded in kind. He moved for Socia's removal as Polar Holding's secretary and demanded his resignation from the board of directors. These motions passed by a vote of three to two, with the board resolving to "remove Richard Socia as the company's Secretary" and to "demand Richard Socia's resignation" from his position on the board. Fay was contemporaneously appointed as Polar Holding's new secretary.

Three days later, on January 29, 2007, Polar Holding's board of directors held another meeting. Socia and MacKenzie—the two directors who had voted against Nelson's motions at the previous meeting—did not attend. Their names appear in the minutes as absent directors. At this meeting, the board voted to appoint Sharon Minnock "to fill a vacancy on the Board of Directors." The board next passed a motion demanding MacKenzie's resignation from the board and calling "for the removal of both Richard Socia and Robert MacKenzie from any and all roles with Polar Molecular Holding Corporation, including roles as officer and Board committee members."

Needless to say, Socia did not take kindly to what had transpired at these meetings. On January 31, 2007, he wrote Nelson a letter that begins as follows:

> I think it is time to set the record straight. I am a Director, of Polar Molecular Holding Company, who serves at the pleasure of the shareholders, not you. I want you to produce the written authority—not your interpretation—that gives you and/or your puppets the authority to remove me. I want you to know I have no intention of resigning from this Board.

The letter concludes in similar fashion: "I am going to continue to protect the shareholders."

Socia reaffirmed these sentiments in a March 5, 2007 letter to Minnock, in which he referred to himself as a director, questioned the legality of Minnock's appointment to the board, and stated flatly that he "refused to resign" from his position. He also provided an explanation for this refusal: "I refused to resign my post as Director for one reason, Mark [Nelson] duped me and I know I am a representative of shareholders[;] not just specific shareholder interests, but all shareholders. I will continue to work to save the products and opportunities that exist at Polar."

After the board refused to oust Nelson and purported to replace Socia instead, Socia came up with an idea. He knew that PMC had entered into a financing agreement with Affiliated Investments, LLC (Affiliated) in October 2001. Under the terms of that agreement, PMC had received a $600,000 loan from Affiliated, which PMC promised to repay in full by January 2005. But PMC had defaulted on its repayment obligations and remained in default in early 2007. Despite PMC's default, Affiliated had not yet sought repayment of the loan. Nor had it taken legal action to recover the patents and other intellectual property that PMC had pledged as collateral. Affiliated's president, Bruce Becker, stated that he had not done so because he "had no knowledge of [the petroleum-additive] industry or what to do with the patents."

But Socia suffered from no such lack of expertise, and he suggested to Becker a way in which the two could exercise Affiliated's right to foreclose on the defaulted loan. Socia, Becker, and Carl Hill, the latter being a Polar Holding consultant, would form a new company for the purpose of purchasing the promissory note from Affiliated and then immediately bring a foreclosure action against Polar Holding to secure the

collateral.  According to Socia's deposition testimony, he intended for the foreclosure to put pressure on Nelson to make certain business decisions with respect to PMC that Socia thought would make PMC more profitable.  A March 16, 2007 email sent by Hill to Socia and Karen Dobleske (Becker's business manager at Affiliated) provides a glimpse into how the plan unfolded:

> Dick [Socia] came up with a thought that I think might make a lot of sense.  Since [PMC] owes Affiliated the patents that are new and not included in the escrow arrangement[,] . . . maybe Affiliated ought to ask for those patents to be put into the escrow account now . . . before we make our move through foreclosure.  Nelson would have a hard time arguing about the request[,] . . . especially since Affiliated just sent him dough to help with patent registration.

(Ellipses in original.)

Socia, Becker, and Hill incorporated Petroleum on March 22, 2007, with its principal place of business in Essexville, Michigan.  On April 18, 2007, Socia submitted his resignation as a director of Polar Holding, effective immediately.  He cited as the "last straw" a conversation that he had had with Fay three days earlier regarding product-liability insurance.  Eight days after Socia's resignation, Affiliated assigned all of its rights, title, and interest in PMC's promissory note and collateral to Petroleum in exchange for $2 million.

Prior to these events, PMC had been seeking to shore up its financial standing.  Its principal means of doing so was through a financing agreement with a company called IBK Capital Corporation (IBK).  IBK's president, William White, signed an engagement letter in December 2006 stating that IBK would "endeavor to obtain for [PMC] . . . a private placement of up to $10.0 million of convertible preferred shares or some other acceptable financing arrangement."  The letter provided that the agreement would "continue for six months," but also stated that the agreement could "be terminated or extended" by either IBK or PMC at any time "upon notice in writing."  Nelson returned the letter to IBK with his signature after discussing the matter at an executive-committee meeting later that same month.  Socia was not a member of the executive committee and thus did not attend the meeting.

On January 2, 2007, IBK received Polar Holding's Form 10-K (an annual filing required by the Securities Exchange Act of 1934) for the fiscal year ending on December 31, 2004. Prior to receiving this form, IBK had not conducted any research into the financial background of Polar Holding or PMC, nor had it reviewed any financial-reporting information submitted by either company.

The initial review of Polar Holding's Form 10-K by IBK's staff noted several "red flags," including that the form was two years old, disclosed extensive litigation involving Polar Holding or PMC, and revealed that there had been a change in the accounting firm that audited Polar Holding's finances. White then reviewed the information himself and was not comforted. Based on these concerns, IBK decided to terminate its efforts to seek a financing arrangement for PMC. White notified Nelson of IBK's decision in a letter dated January 22, 2007.

In his deposition testimony, Nelson stated that White later implied—during a conversation that "[c]ould have been" in 2008—that Socia had contacted White prior to IBK's termination of the engagement letter. Later, in a handwritten amendment to his deposition, Nelson clarified when this conversation allegedly took place: "Based on a telephone discussion I had with IBK [a]t about 1:45 PM on June 5th, 2008 I believed Dick Socia had spoken with IBK."

White, however, denied that any conversation between the two took place in 2008. And Socia stated that he has never communicated with anyone at IBK, including White. White further testified that his standard business practice is to make a record of such conversations, and that no record of this kind exists regarding Socia. He also said that IBK's decision to terminate its efforts to seek financing for PMC was based solely on the "red flags" raised in IBK's independent review of Polar Holding's Form 10-K, not on any conversation with Socia or anyone else affiliated with Polar Holding or PMC.

Without financing, PMC was unable to repay its loan to Affiliated. Petroleum advised Woodward (the escrow agent in possession of the collateral) in May 2007 that it was now the holder of PMC's promissory note and collateral, and that PMC was in

default on its obligations under the loan agreement. Woodward, however, refused to deliver the collateral to Petroleum for reasons not stated in the record.

**B.    Procedural background**

In June 2007, Petroleum filed a complaint against Woodward in the United States District Court for the Eastern District of Michigan. The complaint requested that Woodward be ordered to release possession of the collateral that he was holding in escrow and to deliver it to Petroleum. On September 14, 2007, the district court did just that. Approximately two weeks later, Petroleum proposed procedures for the sale of the collateral in accordance with Article 9 of the Uniform Commercial Code. The sale was eventually scheduled for January 14, 2008. Any proceeds greater than the amount of the unpaid debt would be returned to PMC.

Polar Holding and PMC then moved to intervene in the lawsuit. The district court granted their unopposed motion on November 7, 2007. Shortly thereafter, Polar Holding and PMC filed counterclaims against Petroleum and a third-party complaint against (among others) Affiliated, Becker, Hill, and Socia. Polar Holding and PMC alleged claims under Michigan law for breach of fiduciary duty, civil conspiracy, and tortious interference. The gist of their allegations is that Petroleum was formed by fiduciaries of Polar Holding for the sole purpose of acquiring PMC's promissory note and collateral, and that the named individuals meddled in Polar Holding's relationship with IBK and caused IBK to terminate its efforts to seek financing for PMC.

In January 2008, PMC filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Colorado. The petition automatically stayed the sale of the collateral, but the petition was later dismissed when PMC's counsel withdrew because of an ethical conflict. PMC then filed a second Chapter 11 bankruptcy petition in the same court in August 2008, which again caused the sale of the collateral to be stayed. Two months later, PMC commenced an adversary proceeding in the bankruptcy court against Petroleum. The adversary proceeding was transferred to the United States District Court for the Eastern District of Michigan in January 2009, where the proceeding was consolidated with the present case.

PMC's Chapter 11 bankruptcy case was converted to a Chapter 7 liquidation shortly thereafter, and the bankruptcy court appointed a trustee to act as the representative of PMC's estate. As a consequence of these developments, all of PMC's assets—including its legal claims against Petroleum and the third-party defendants—are controlled by the trustee. The bankruptcy court lifted the automatic stay in July 2009 and authorized Petroleum to proceed with the foreclosure sale. When the sale took place in September 2009, Petroleum was the only bidder, with a bid of $1.85 million.

Because PMC no longer had the independent ability to pursue its claims in the district court, and because PMC's counterclaims and third-party complaint had been filed jointly with Polar Holding, the district court directed Polar Holding in January 2010 "to file a supplemental complaint as to its counterclaims and third-party complaint." *Petroleum Enhancer, LLC v. Woodward*, No. 07-12425-BC, 2010 WL 100892, at *6 (E.D. Mich. Jan. 5, 2010) (unpublished opinion). The court also determined that Polar Holding's claims, to be set forth in its supplemental complaint, "must be based on a breach of a primary duty to [Polar Holding], with a resultant injury to [Polar Holding] that is not derived from a breach of duty with a resultant injury to [PMC] that could be recovered by the trustee if he or she decides to pursue the cause of action." *Id.*

Not long after the district court's order, Polar Holding filed its supplemental complaint, and discovery was taken. In August 2010, the Petroleum parties filed a motion for summary judgment with respect to all of Polar Holding's claims. The district court granted the motion in its entirety in January 2011. Polar Holding has timely appealed, but its appeal is limited to the dismissal of its claims against Socia and the other individual third-party defendants; the dismissal of its claims against Petroleum and Affiliated is not being challenged.

## II. ANALYSIS

### A.     Standard of review

We review de novo a district court's grant of summary judgment. *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011). Summary judgment is proper where "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Because jurisdiction in the present case is based on diversity of citizenship, we must "apply state law in accordance with the controlling decisions of the state supreme court." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007). We will therefore apply Michigan substantive law to each of Polar Holding's claims. "If we confront an issue that has not yet been resolved by the Michigan courts, we must attempt to predict what the Michigan Supreme Court would do if confronted with the same question." *Mazur v.Young*, 507 F.3d 1013, 1016 (6th Cir. 2007) (brackets and internal quotation marks omitted). "In such circumstances, we consider decisions of the Michigan Court of Appeals as well as relevant Michigan Supreme Court dicta, restatements of law, law-review commentaries, and the rules adopted by other jurisdictions." *Id.* at 1016-17.

## B.    Breach of fiduciary duty

Polar Holding's first claim is that Socia breached his fiduciary duty to the company by inducing Affiliated to foreclose on PMC's loan and by creating a competing company for the sole purpose of acquiring PMC's promissory note and collateral from Affiliated. Although Polar Holding alleged in the district court that *all* the Petroleum parties (corporate as well as individual) breached their fiduciary duties to Polar Holding, its appellate briefs argue the issue in detail only with respect to Socia. The breach-of-fiduciary-duty claim as to the other parties has therefore been waived. *See Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) (declining to address an issue on appeal because the appellant had not made "some effort at developed argumentation"

and "failed to discuss or cite to the district court's analysis in any detail" regarding the issue in question (internal quotation marks omitted)).

Under Michigan law, "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v. Lutheran Church Mo. Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999). When such a relationship exists, the fiduciary—that is, the one who is entrusted to advise the other—"has a duty to act for the benefit of the principal regarding matters within the scope of the relationship." *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906 (Mich. Ct. App. 2005) (per curiam). A fiduciary must "'subordinat[e] one's personal interests to that of the other person.'" *Wallad v. Access BIDCO, Inc.*, 600 N.W.2d 664, 666 (Mich. Ct. App. 1999) (per curiam) (emphasis omitted) (quoting Black's Law Dictionary (6th ed.)). "Whether a duty exists is a question of law for the court to decide." *Prentis*, 698 N.W.2d at 906.

"It is beyond dispute that in Michigan, directors and officers of corporations are fiduciaries who owe a strict duty of good faith to the corporation which they serve." *Prod. Finishing Corp. v. Shields*, 405 N.W.2d 171, 174 (Mich. Ct. App. 1987); *see also* M.C.L. § 450.1541a(1) (codifying the common-law rule). But "[j]ust where the fiduciary obligation of corporate officers and directors ends and the personal right of independent action begins in ordinary business dealings may be difficult to determine, and no hard and fast rule of demarcation can be laid down." 3 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 860 (perm. ed., rev. vol. 2010). "When a corporate officer ceases to act as such, either because of his or her resignation or removal from office, or because of the insolvency of the corporation, the fiduciary relationship ceases." *Id.*

In the present case, Socia clearly had a fiduciary duty to Polar Holding when he was elected as a director by the shareholders in July 2003. The key question on appeal is whether that duty had been legally extinguished by the end of January 2007, when the board voted to demand his resignation as a director and after which Socia helped hatch the plan to foreclose on the PMC loan and form a competing company.

In granting summary judgment for the Petroleum parties, the district court answered this question in the affirmative. The court acknowledged that Socia technically remained on the board of directors until his resignation in April 2007. But it concluded that he "was effectively terminated as a director at the January 26, 2007 board meeting and thus owed no fiduciary duty to [Polar Holding]" after that date. *Petroleum Enhancer, LLC v. Woodward*, No. 07-12425-BC, 2011 WL 124451, at \*10 (E.D. Mich. Jan. 14, 2011) (unpublished opinion). The court reasoned that a fiduciary relationship ceased to exist, as did its accompanying duty, because Socia was excluded from participating in all business decisions as of January 26, 2007. It therefore did not consider whether the duty had actually been breached.

Polar Holding argues on appeal that the district court's reasoning is flawed. Its argument is premised on two fundamental rules of Michigan law: (1) that a director owes a strict fiduciary duty to his company, *see Shields*, 405 N.W.2d at 174, and (2) that a company's board of directors has no authority to remove a fellow director, *see* M.C.L. § 450.1511(1) (providing that a company's *shareholders* have the power to elect and remove directors). From these premises, Polar Holding contends that Socia's fiduciary duty existed until he either resigned from the board or was removed by the shareholders. Because Socia did not resign until April 18, 2007 and was not removed by the shareholders before then, Polar Holding argues that his duty continued until that date.

Polar Holding refers to several additional pieces of evidence in support of its argument, including the fact that Socia was still listed as a director in the board minutes for the January 29, 2007 meeting and that he twice referred to himself as a director in subsequent correspondence. Based on this correspondence, Polar Holding points out that Socia steadfastly refused to resign from his position prior to April 18, 2007. And Polar Holding explains Socia's absence from the "meetings and business decisions" mentioned in the district court's opinion by claiming that these were meetings and decisions of the executive committee, on which Socia did not sit, rather than meetings of the board.

The Petroleum parties respond to Polar Holding's arguments by echoing the reasoning of the district court. Their core point is that the board voted on January 26, 2007 to "remove Richard Socia as the company's Secretary" and resolved "to demand Richard Socia's resignation" from his position on the board. Three days later, the board met again and appointed Minnick "to fill a vacancy on the Board of Directors." These actions, the Petroleum parties argue, effectively stripped Socia of his directorial authority and, in so doing, relieved him of his fiduciary obligations. Under this view, what matters is that Socia stopped *functioning* as a director subsequent to the January 26, 2007 meeting; that he did not *formally resign* until April 18, 2007 is of no consequence. As Socia put it, he may have remained a director "from a technical standpoint" following the meetings, but he was not one "from a realistic standpoint."

The Petroleum parties attempt to bolster their argument by citing the case of *Voss Engineering, Inc. v. Voss Industries, Inc.*, 481 N.E.2d 63 (Ill. App. Ct. 1985), which involved a father who brought suit against his son, a former director, officer, and employee in the father's corporation. After a family dispute (the son refused to see his mother in the hospital), the father informed the son that he no longer had any position with the company. In addition, the father told the son that he would have one month to make amends with his mother and that "there would not be any problems" provided that he did so. *Id.* at 65. But the son did not reconcile with his mother, and he never returned to the company. He never again performed directorial duties, attended corporate meetings, or acted on behalf of the corporation in any capacity. On the other hand, the son did not submit his formal resignation as a director until seven months after he had been conditionally terminated, by which point he had already established a competing business organization.

When the case reached the Appellate Court of Illinois, the sole issue was whether the son owed a fiduciary duty to the company during the period between his conditional termination and his formal resignation. The trial court had determined that he owed no such duty, and the appellate court reviewed this determination under the manifest-weight-of-the-evidence standard.

In affirming the trial court's decision, the Appellate Court of Illinois found that "the evidence and the applicable law support not only [the son's] subjective belief that his directorship was terminated but also the objective fact that he had been removed as a director on the effective date of his conditional termination." *Id.* at 66. The court noted that, during the relevant time period, "there was no statutory provision governing the removal of corporate directors." *Id.* And "where the law is silent as to the tenure of office, the subject of removal, and the mode of proceeding to remove, reference must be had to the nature of a particular set of facts to determine what course justice requires the removing power to pursue." *Id.* at 66-67.

The court then determined on the "particular set of facts" before it that the son had been effectively removed as a director of his father's company. As the company's "majority shareholder and electing authority," the father had the ability to elect the members of the board of directors. *Id.* at 67. The court reasoned that

> [i]ncidental to his power to elect, [the father], unencumbered by statute, had the power to remove. His actions in regard to [his son] were consistent with the exercise of this power. The submission of [the son's] formal resignation some seven months later does not, by its mere form, negate the substance of the removal.

*Id.* This substance-over-form reasoning, the Petroleum parties submit, should apply with equal force in the present case.

In our view, however, *Voss* does not bear the weight that the Petroleum parties place upon it. The question in *Voss* was whether, in the absence of a statutory provision governing the removal of corporate directors, the father had exercised his removal power. This is quite different from the question here. A Michigan statute provides that shareholders—not the board of directors—may remove directors by majority vote. *See* M.C.L. § 450.1511(1). And Michigan's caselaw has long so held. *See, e.g.*, *Stott v. Stott Realty Co.*, 224 N.W. 623, 624 (Mich. 1929) ("The director, being selected by the stockholders, may only be removed by them.").

Under Michigan law, therefore, Polar Holding's directors did not have the authority to remove Socia as a director simply through board action. In fact, the directors (who also owned shares of Polar Holding's stock) did not have the majority control necessary to remove Socia *even in their capacity as shareholders*. Polar Holding's Form 10-K for the 2004 fiscal year indicates that "stockholders holding approximately 42% of the Company's outstanding common stock as of October 31, 2005, entered into a voting agreement dated June 3, 2003, whereby they have agreed to vote all of their outstanding shares in accordance with instructions provided by Mark Nelson." Elsewhere, the Form 10-K reveals that this group of shareholders included Nelson and all but one Polar Holding director (the lone exception being former director Wayne Wright, who owned less than one percent of the company's outstanding shares), and that the voting agreement consisted of 37.6 percent of the Polar Holding's common stock.

Whatever the reason for the discrepancy between these two figures, the record indicates that the board of directors as a whole, including Nelson, controlled less than half of Polar Holding's voting shares. This stands in stark contrast to *Voss*, where the father was the company's "majority shareholder and electing authority," and therefore also its removing authority. Only within this context did the *Voss* court turn to circumstantial evidence and policy considerations to ascertain whether the father had in fact exercised his authority to remove his son as a director. There is no occasion to take into account such considerations here.

And even if there were occasion to consider circumstantial evidence and policy implications here, *Voss* would still be inapposite. The son in *Voss* subjectively believed that he had been removed as a director, and he severed all ties with the company after his conditional termination. Socia apparently believed just the opposite. He obviously still considered himself a member of the board when he wrote his March 5, 2007 letter to Minnock, in which he reaffirmed his refusal to resign. Given these distinctions, and given that there is no indication that a majority of the shareholders (the only group with the power to remove Socia from the board) wanted him out of that position, there is

simply no basis to deviate from Michigan's settled rule that a director cannot be removed by the other directors.

Nor is there a sound policy reason for doing so. To the contrary, Michigan law respects the basic principle that "the directors of a corporation owe fiduciary duties to *stockholders*," not to fellow directors. *Wallad v. Access BIDCO, Inc.*, 600 N.W.2d 664, 666 (Mich. Ct. App. 1999) (per curiam) (emphasis added). This principle is particularly important when the company is publicly held, as Polar Holding was here. At the same time, the general rule—that directors owe a fiduciary duty to their corporation until they resign, their term ends, or they are officially removed from their position—does not place an onerous burden on directors who prefer to be unencumbered by fiduciary obligations. The message to such directors is simple: resign. Because Socia repeatedly refused to do that here, his fiduciary duty to Polar Holding continued until he did so on April 18, 2007.

This is not to say that Socia in fact breached his fiduciary duty to Polar Holding, or even that the evidence is sufficient to require submitting the issue to a jury. The district court has not yet considered the question. But we do say that the district court erred in holding as a matter of law that Socia had no such duty after the January 26, 2007 board meeting. The district court's grant of summary judgment on Polar Holding's breach-of-fiduciary-duty claim is therefore reversed as to Socia, but affirmed as to the other Petroleum parties.

## C.     Civil conspiracy

Polar Holding's second claim is that the individual Petroleum parties—specifically including Becker, Hill, and Socia—committed the tort of civil conspiracy. This tort consists of "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means." *Mays v. Three Rivers Rubber Corp.*, 352 N.W.2d 339, 341 (Mich. Ct. App. 1984).

As these elements indicate, "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort." *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986). Here, there are only two possible independent torts upon which the conspiracy claim could be predicated: breach of fiduciary duty and tortious interference. Polar Holding relies on the former in its briefs to this court, alleging that Becker and Hill were among those aware of Socia's fiduciary obligations to Polar Holding and took actions that led to the breach of the same.

As discussed above, the district court held that Socia did not have a fiduciary duty to Polar Holding during the relevant period. But the court did not dismiss the civil-conspiracy claim on this ground. Instead, the court determined that Polar Holding lacked standing to bring the claim because the company could not show that it had suffered an injury that was distinct from that suffered by PMC, a showing that the court had previously held was necessary to avoid making the claim a "derivative" action of the kind generally barred by M.C.L. § 450.1493a (providing that, before bringing a derivative action on behalf of a corporation, a shareholder must demand in writing that the corporation enforce its rights or demonstrate that such a request would be futile). *See Petroleum Enhancer, LLC v. Woodward*, No. 07-12425-BC, 2011 WL 124451, at *7 (E.D. Mich. Jan. 14, 2011) (unpublished opinion) (reiterating the court's earlier conclusion that Polar Holding's claim "must be based on a breach of primary duty to [Polar Holding], with a resultant injury to [Polar Holding] that is not derived from a breach of duty with resultant injury to PMC that could be recovered by the trustee if he or she decides to pursue a cause of action" (internal quotation marks omitted)).

The district court considered and rejected Polar Holding's argument that it had been injured by "losing an opportunity to obtain the collateral at [the] foreclosure sale." *Id.* (internal quotation marks omitted). And the court also rejected Polar Holding's argument "that it has standing to bring a claim for this lost opportunity because Socia was a board member of [Polar Holding] though not of PMC." *Id.*

The district court's analysis focused on whether Polar Holding had suffered an injury that was not also suffered by PMC. This analysis is grounded in the notion that an "injury arising solely out of harm to a subsidiary corporation is generally insufficient to confer standing on a parent corporation." *See* 9 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 4227 (perm. ed., rev. vol. 2010); *see also Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir.), *vacated in part on other grounds on reh'g*, 828 F.2d 1145 (6th Cir. 1987) (applying Michigan law and recognizing the "general precept of corporate law that a shareholder of a corporation does not have a personal or individual right of action for damages based solely on an injury to the corporation"); *Mich. Nat'l Bank v. Mudgett*, 444 N.W.2d 534, 536 (Mich. Ct. App. 1989) (per curiam) ("In general, a suit to enforce corporate rights or to redress or prevent injury to the corporation, whether arising out of contract or tort, must be brought in the name of the corporation and not that of a stockholder, officer or employee.").

But the district court's analysis misses a crucial point. As other jurisdictions have recognized, "an exception to this rule exists where the defendant owes the plaintiff [parent] shareholder a fiduciary duty, and the plaintiff seeks to recover for a breach of that duty." *Qantel Corp. v. Niemuller*, 771 F. Supp. 1361, 1367 (S.D.N.Y. 1991) (applying New York law); *see also Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 (2d Cir. 1980) ("Delaware law, which governs in this diversity suit, makes a breach of fiduciary duty actionable irrespective of injury." (footnote omitted)); *Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 223 F.R.D. 566, 629 (D. Kan. 2004) ("A limited exception exists where the alleged wrongdoer owed a fiduciary duty directly to the parent corporation and the parent seeks to recover for breach of that duty which resulted in the diminution in value of the parent's shares of the subsidiary."). "In such a case, the plaintiff parent shareholder has standing to recover . . . , despite the fact that the subsidiary corporation may itself have a claim against the defendant for the direct injury to it." *Qantel*, 771 F. Supp. at 1367; *see also Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 476 (D. Md. 2005) (holding that, under Delaware law, a director of both the parent corporation and the subsidiary owed separate fiduciary duties to each

company, so the parent had standing to sue the director for breaches that directly caused it harm).

These cases, we acknowledge, do not involve the application of Michigan law. As far as we can tell, no Michigan court has yet confronted this precise issue. But Michigan courts *have* confronted the analogous situation in which an individual shareholder seeks to bring an action based on the "breach of a duty that [was] owed to the individual personally." *See Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 278-79 (Mich. Ct. App. 2003) (per curiam). And in that context, "[t]he general rule"—that a suit "to redress or prevent injury to the corporation . . . must be brought in the name of the corporation and not that of a stockholder"—"is inapplicable." *See Mudgett*, 444 N.W.2d at 536. We see no reason why this exception should not apply when the shareholder is a corporation.

The facts of this case drive home the point. Polar Holding's civil-conspiracy claim is predicated upon the breach of a fiduciary duty that was owed directly to Polar Holding, not to PMC. As Polar Holding points out, Socia did not owe a fiduciary duty to PMC at the time of the alleged breach because he was not a director or officer of that company. PMC therefore cannot bring a claim based on an alleged breach of fiduciary duty by Socia. So Polar Holding's claims based on such breach—including its civil-conspiracy claim—are not derivative in nature. *See* M.C.L. § 450.1491a(a) (defining a "derivative proceeding" as "a civil suit *in the right of* a domestic corporation" (emphasis added)).

We conclude that Polar Holding has standing to bring the civil-conspiracy claim, just as it has standing to bring the breach-of-fiduciary-duty claim. The district court's grant of summary judgment in favor of the individual Petroleum parties on the civil-conspiracy claim is accordingly reversed. On remand, the district court should proceed to address this claim on the merits.

**D.        Tortious interference**

Polar Holding's final claim is that the Petroleum parties tortiously interfered with PMC's potential financing agreement with IBK.  Tortious interference with a business relationship consists of "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach of termination of the relationship or expectancy, and resultant damage to the plaintiff."  *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) (internal quotation marks omitted).

The district court found that there was insufficient evidence that any of the Petroleum parties intentionally interfered with IBK's pontential financing of PMC.  In arguing otherwise, Polar Holding points to a handwritten amendment to Nelson's deposition that reads:  "Based on a telephone discussion I had with IBK [a]t about 1:45 PM on June 5th, 2008[,] I believed Dick Socia had spoken with IBK."  Polar Holding also refers to two emails that were allegedly written and sent by Nelson to White (IBK's president) in June 2008.  These emails were not produced during discovery, but were attached to an affidavit in support of Polar Holding's opposition to the Petroleum parties' motion for summary judgment.  In the first email, Nelson wrote:  "Polar understands that IBK (or any investment broker) would not have been able to proceed with the previous financing for Polar when Polar Board member Dick Socia and insider consultant Carl Hill made direct contact with IBK in January 07 and undermined Polar's financing with IBK."  And the second email includes the following:  "I've asked you to provide a letter detailing the disruptive contacts that were made to you (and any written materials they may have provided) by dissident directors of Polar that caused you to pull out of the $10 million preferred stock offering deal contracted with Polar in January of last year."

Setting aside the unorthodox way in which these emails came to light, they are at best only weak circumstantial evidence of tortious interference.  *See Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) (noting that hearsay evidence is insufficient to defeat a motion for summary judgment).  They are also unsupported,

conclusory, and entirely after-the-fact. Moreover, they are contradicted by Hill, Socia, and White, each of whom testified that White had never discussed with either Hill or Socia the potential financing agreement between IBK and PMC.

To survive summary judgment, Polar Holding "must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 246 (6th Cir. 2010) (internal quotation marks omitted). Here, Polar Holding has not presented any "significant probative evidence" of tortious interference. This claim consequently cannot survive summary judgment.

Polar Holding also contends that it asserted a separate tortious-interference claim against Socia that the district court failed to address. In that claim, Polar Holding alleges that, in approaching Becker and asking him to foreclose on PMC's loan, Socia tortiously interfered with Polar Holding's relationship with PMC—specifically, PMC's ability to continue making payments on debts owed by Polar Holding. Because Polar Holding is correct that this tortious-interference claim was raised below but not considered, we will remand this claim as well.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the dismissal of Polar Holding's tortious-interference claim with respect to the IBK financing issue, but **REVERSE** the dismissal of its breach-of-fiduciary-duty claim against Socia and its civil-conspiracy claim against the individual third-party defendants, and **REMAND** the case for further proceedings on the latter two claims, as well as on Polar Holding's tortious-interference claim not addressed below.