**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0184n.06

Case No. 13-1369

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 07, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PETROLEUM ENHANCER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| LESTER R. WOODWARD, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant, | ) | |
| | ) | |
| POLAR MOLECULAR CORP., | ) | **O P I N I O N** |
| | ) | |
| Intervenor Plaintiff, | ) | |
| | ) | |
| POLAR MOLECULAR HOLDING CORP., | ) | |
| Interpleader/Third Party Plaintiff-Appellant, | ) | |
| | ) | |
| AFFILIATED INVESTMENTS, LLC; | ) | |
| BARBARA SOCIA, PERSONAL | ) | |
| REPRESENTATIVE OF THE ESTATE OF | ) | |
| RICHARD J. SOCIA, DECEASED; CARL HILL; | ) | |
| BRUCE BECKER; A. RICHARD NELSON, | ) | |
| | ) | |
| Third Party Defendants-Appellees. | ) | |
| | ) | |

BEFORE: GILMAN, COOK, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** The present case involves a bitter corporate dispute that has prompted years of litigation and several rounds of bankruptcy proceedings. Polar Molecular Holding Corporation ("Polar Holding") is a publicly traded Delaware corporation that owns

entirely Polar Molecular Corporation ("PMC"), a privately held Delaware corporation. PMC

was in the petroleum-additives business and owned numerous patents and trademarks; the

company was also heavily indebted, and had defaulted on a loan to Affiliated Investments, Inc.

("Affiliated"). The loan was secured by all of PMC's intellectual property. Following an

acrimonious dispute on Polar Holding's board, one of the directors, Richard Socia ("Socia"),

formed a separate company named Petroleum Enhancer, LLC ("Petroleum Enhancer").

Petroleum Enhancer then acquired Affiliated's interest in PMC's promissory note and collateral.

In 2007, Petroleum Enhancer foreclosed on PMC's defaulted loan and brought suit to obtain

possession of the intellectual property held as collateral. Polar Holding subsequently brought

counterclaims[1] asserting breach of fiduciary duty, civil conspiracy, and tortious interference

against Richard Socia, Bruce Becker, and Carl Hill ("defendants").[2] The district court granted

the defendants' motion for summary judgment.

Having determined that there is not a genuine issue of material fact, we **AFFIRM** the

district court's grant of summary judgment on all claims.

---

[1] This case presents a complicated factual and procedural posture after nearly six years of litigation. We have summarized only the *relevant* portions of the record. For a more in-depth discussion of this case's factual and procedural background, see *Petroleum Enhancer, LLC v. Woodward, et al*, 690 F.3d 757 (6th Cir. 2012).

[2] Technically, Richard Socia, Bruce Becker, and Carl Hill are third-party defendants and appellees, but for purposes of identification in this opinion, we shall refer to them collectively as "defendants."

I.      **BACKGROUND**

PMC's core business involved exploiting its intellectual property to manufacture fuel enhancers on a large scale.   On October 25, 2001, PMC executed a promissory note with Affiliated, and in return, PMC promised to pay Affiliated $600,000 plus interest by December 26, 2001.

As collateral for the loan, Affiliated obtained a first-priority lien on, among other items, PMC's current and future intellectual property.  This included the rights to "all patents . . . and all other intangible property of every kind and nature."  R. 155-4, Sec. Agreement, § 2(d), PageID # 3411.  The security agreement also assigned to Affiliated all future assets, including "[a]ll assets or other property similar to any of the foregoing hereafter acquired by [PMC]."  *Id.* at § 2(g), PageID # 3412.

From the outset, PMC experienced difficulty repaying its loan, and was forced to negotiate for successive loan extensions from 2001 through 2005.  As part of a loan extension on August 23, 2004, PMC agreed to place some of the intellectual property used to secure its loan in escrow with instructions that it be delivered to Affiliated in the event PMC defaulted.  After the eighth loan extension, Bruce Becker ("Becker"), Affiliated's president and owner, decided that "no further extensions would be granted."  R. 149-9, Aff. Becker at 2–3, PageID # 3124–25.  As Polar Holding, PMC's parent company, described the situation in its 2004 report filed with the Securities and Exchange Commission:

> Substantially all of our assets, including our intellectual property, are subject to liens by our creditors, and these creditors could foreclose on substantially all of our assets if we default on our obligations.  We are currently in default on a number of our notes payable . . . . There can be no assurance that we will be in a position to pay our obligations to the employees and advisors under this agreement and free our assets of the contingent lien in the near future.

R. 149-4, Form 10-KSB Polar Holding at 8, PageID # 2886. On January 7, 2005, PMC officially defaulted. Affiliated, however, did not seek to immediately foreclose on the loan.

Even after the loan default, Polar Holding still sought to develop sources of financing,[3] as well as to develop deals that would create new revenue streams to save PMC. In 2006, Mark Nelson ("Nelson"), PMC's president and Polar Holding's CEO and chairman of its board of directors, sought an extensive distribution contract with a trucking company for one of PMC's products. Simultaneous with Nelson's efforts, Socia, who also served as a board member for Polar Holding, attempted to negotiate an exclusive distribution contract for the same product with a different vendor.

Their diverging and competing business strategies placed Nelson and Socia at loggerheads. During the fall of 2006, the disagreement escalated, resulting in Socia allegedly being excluded from board activities. The conflict culminated in January 2007 when Socia attempted to oust Nelson from the board. Nelson successfully rebuffed the effort, and in turn moved for Socia's removal, which was approved by a three-to-two vote. Despite the board's demand that he resign, Socia refused, asserting that only the shareholders could remove him.

Following his unsuccessful attempt to unseat Nelson from the board, Socia approached Affiliated's owner, Becker, with a plan. Until this point, Becker had not initiated any action to recover PMC's intellectual property, in part because he recognized that he "had no knowledge of the [petroleum-additive] industry or what to do with the patents." *Petroleum Enhancer*, 690 F.3d at 762. Socia, however, did have the requisite knowledge. Allegedly, under Socia's plan, an

---

[3] Most promisingly, IBK Capital Corporation ("IBK") indicated in an engagement letter in December 2006 that it would attempt to facilitate a $10 million preferred-stock offering. This fresh influx of capital fell through in January 2007 when IBK, as part of its due diligence, noted that PMC was involved in extensive litigation and had recently changed its accounting firm. Unable to obtain additional financing, PMC could not repay Petroleum Enhancer when it later foreclosed.

independent corporation would purchase Affiliated's secured promissory note, and after foreclosing on PMC's loan, recover the intellectual property that PMC had given as collateral.

On March 22, 2007, Socia, Carl Hill ("Hill"), who was a former consultant for PMC, and Affiliated, through Becker, created Petroleum Enhancer, a Michigan limited-liability corporation. At the time of Petroleum Enhancer's formation, Socia was still a member of Polar Holding's board. Socia submitted his letter of resignation on April 18, 2007. Eight days later, on April 26, Affiliated assigned its interest in the PMC note and collateral to Petroleum Enhancer for $2 million.

Shortly after Petroleum Enhancer's formation on May 25, 2007, and at Socia's suggestion,[4] Affiliated requested that PMC place additional intellectual property[5] in the escrow account to facilitate any future foreclosure. At the time the request was made, Affiliated had not yet notified Polar Holding of its intent to initiate foreclosure proceedings. Nelson, Polar Holding's CEO, complied with Affiliated's request and ordered that the intellectual property be placed in the escrow account, though he later contended that he would not have done so had he known that Affiliated intended to foreclose.

On June 5, 2007, Petroleum Enhancer brought suit against the escrow agent to turn over the intellectual property securing PMC's defaulted loan. PMC and Polar Holding moved to intervene, and Polar Holding subsequently filed counterclaims against Socia,[6] Hill, and Becker, among others. These counterclaims alleged breach of fiduciary duty, tortious interference, and civil conspiracy under Michigan law. The district court granted the motion to intervene.

---

[4] Although the exact date of the idea's genesis is not clear, it appears that Socia was still a member of Polar Holding's board when he made the suggestion.
[5] The additional intellectual property appears to have consisted of pending patent applications and possibly some patents.
[6] Socia has since died, and his estate has been substituted as a defendant.

On January 11, 2008, PMC filed for bankruptcy, automatically staying the sale of the intellectual property. The first Chapter 11 bankruptcy proceeding was dismissed when PMC's counsel withdrew. A second bankruptcy proceeding began, which was converted into a Chapter 7 liquidation proceeding. As part of this proceeding, the bankruptcy court appointed a trustee to control the assets of PMC's estate, including its legal claims. In July 2009, the bankruptcy court lifted the stay that had previously precluded the sale of the collateral, and authorized the sale of PMC's intellectual property. At the foreclosure sale, which was closely overseen by the district court, Petroleum Enhancer was the sole bidder and purchased the intellectual property for $1.85 million.

Petroleum Enhancer and the other defendants moved for summary judgment on August 2, 2010 as to the claims raised by Polar Holding. The district court granted the motion dismissing Polar Holding's claims, and in a subsequent order, dismissed PMC's claims without prejudice for failure to prosecute, the latter claims being controlled by the bankruptcy trustee. Polar Holding appealed the grant of summary judgment, but only as to its claims against Socia, Hill, and Becker.

This court affirmed the grant of summary judgment in part, but remanded the case to determine whether there was a genuine dispute of material fact regarding the claims that Socia had breached his fiduciary duty to Polar Holding; that Socia had tortiously interfered with Polar Holding and PMC's business relationship; and that Socia, Becker, and Hill had conspired to breach Socia's fiduciary duty. *See Petroleum Enhancer*, 690 F.3d at 757. On December 5, 2012, Socia, Hill, and Becker brought a renewed motion for summary judgment on the remaining claims. The district court granted the motion on all claims. Polar Holding now appeals the district court's most recent summary-judgment determination.

II.    **ANALYSIS**

A. **Standard of Review**

We review de novo the district court's grant of summary judgment. *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736 (6th Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Facts must be viewed "in the light most favorable to the non-moving party." *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). To survive summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," this court should grant summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In this case, the parties agree, and we have previously found, that Michigan law applies. *See Petroleum Enhancer*, 690 F.3d at 765. We therefore "apply state law in accordance with the controlling decisions of the state supreme court." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007); *Allstate Ins. Co. v. Thrifty Rent-A-Car, Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). "If we confront an issue that has not yet been resolved by the Michigan courts, we must attempt to predict what the Michigan Supreme Court would do if confronted with the same question," and we will consider decisions of the Michigan Court of Appeals and other persuasive sources. *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007) (internal citation and quotation marks omitted).

B. **Breach of Fiduciary Duty**

Polar Holding contends that Socia breached his fiduciary duty by: (1) suggesting to Becker that Affiliated foreclose on PMC's loan; (2) proposing that Affiliated encourage PMC to place additional intellectual property in the escrow account before foreclosure; and (3) forming Petroleum Enhancer to obtain PMC's intellectual property. This court previously determined that Socia had a "fiduciary duty to Polar Holding [that] continued until he [resigned] on April 18, 2007." *Petroleum Enhancer*, 690 F.3d at 769. Because a fiduciary relationship existed, Socia had "a duty to act for the benefit of the other with regard to matters within the scope of the relation." *Teadt v. Lutheran Church Mo. Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999).

Breach of fiduciary duty sounds in tort, *see Miller v. Magline, Inc.*, 256 N.W.2d 761, 774 (Mich. Ct. App. 1977), and therefore, in addition to showing a breach of the actual fiduciary duty, plaintiffs must also demonstrate proximate cause of an injury to be successful on appeal. *See Veltman v. Detroit Edison Co.*, 683 N.W.2d 707, 713 (Mich. Ct. App. 2004) ("The defense of failure to establish proximate cause is an elemental defense."); *Alar v. Mercy Mem'l Hosp.*, 529 N.W.2d 318, 323 (Mich. Ct. App. 1995); *Hillside Prods., Inc. v. O'Reilly, Rancilio, Nitz, Andrews, Turnbull & Scott, P.C.*, Case No. 2006 WL 1360502, *1 (Mich. Ct. App. May 18, 2006) (unpublished). To demonstrate proximate cause, a party must establish both cause in fact and legal cause. *Alar*, 529 N.W.2d at 323. "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause . . . normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994).

1. ***Breach of Fiduciary Duty by Suggesting That Affiliated Foreclose on PMC's Loan***

Polar Holding claims that Socia breached his fiduciary duty by encouraging Affiliated to foreclose on its loan to PMC. We first address whether Socia in fact breached his duty, and then turn to the question of proximate cause.

a. *Breach of Duty*

The question of breach of duty is straightforward. The district court determined that Socia's conduct was not protected by the business-judgment rule and that he had breached his fiduciary duty. On appeal, Socia appears to concede as much. He does not invoke the protection of the business-judgment rule, nor does he argue that his conduct was for the benefit of Polar Holding, or that the district court erred by not applying the business-judgment rule. We agree that by forming an alternate company, while he was a director of Polar Holding, whose sole purpose was to divest PMC of its most valuable asset—its intellectual property—Socia did not act in good faith towards or for the benefit of Polar Holding. As such, he breached his fiduciary duty and is not protected by the business-judgment rule. *See In re Estate of Butterfield*, 341 N.W.2d 453, 458 (Mich. 1983) ("In the absence of bad faith or fraud, a court should not substitute its judgment for that of corporate directors.").

b. *Proximate Cause*

We now turn to proximate cause, finding it to be a much closer issue. The district court granted summary judgment to Socia after concluding that Polar Holding had failed to demonstrate that Socia's breach of fiduciary duty was the proximate cause of any damages incurred by Polar Holding. After reviewing all the evidence, we agree with the district court that summary judgment for Socia is appropriate. Polar Holding has not presented substantial

evidence for a reasonable jury to conclude that "but for" Socia's conduct the foreclosure would not have otherwise occurred.

Polar Holding argues that until Socia pitched his plan to Affiliated to create Petroleum Enhancer, Affiliated's owner, "Becker, had no intentions of foreclosing upon the loan." Appellant Br. at 32.[7]  In support of this contention, Polar Holding notes that "Becker stated that he had not done so because he 'had no knowledge of [the petroleum-additive] industry or what to do with the patents.'" *Petroleum Enhancer*, 690 F.3d at 762.  It is true that Becker's statement explains why Becker, on behalf of Affiliated, had not taken action until that point; he still sought to maximize the return on his investment or at least to minimize his loss.  It is important to note, however, that this statement does not reveal Becker's future intentions.  Even assuming that Socia was the cause of the foreclosure in the present case, Polar Holding offers *no evidence* that, had Socia not interfered, Becker would have allowed the loan to continue in default indefinitely.[8]

Prior to the foreclosure, PMC was in a state of disarray.  The company's attempts to develop new business contracts had not borne fruit, the company's management was in turmoil with board members openly fighting, and the company's most promising sources of new investment capital had fallen through because of litigation and accounting concerns.  Most troublingly, the company had been in default for several years on a loan secured by all of its

---

[7] Polar Holding argues in the alternative that Socia breached his fiduciary duty by failing to disclose his business plan.  In *Production Finishing Corp. v. Shields*, the Michigan Court of Appeals determined that a director "breached his fiduciary duties to the corporation *by diverting a corporate business opportunity* for his own personal gain."  405 N.W.2d 171, 173 (Mich. Ct. App. 1987) (emphasis added).  As the state court of appeals made clear, the breach of fiduciary duty did not arise from the failure to disclose, but from the *actual diversion* of the corporate opportunity.  We thus reject Polar Holding's contention that under *Production Finishing* Becker had a strict duty to disclose his activities.

[8] Because he is not a disinterested witness, we do not give credence in our analysis to Becker's self-avowed declaration that he intended to foreclose independent of Socia's involvement.  *See Reeves v. Sanderson Plumbing s., Inc.*, 530 U.S. 133, 151 (2000).

intellectual property and had been unable to make headway on repaying the sizeable debt that it owed. By any measure, PMC was in serious trouble and at a high risk of foreclosure.

Polar Holding's sole response to all of these concerns is to repeat that Affiliated would not have foreclosed, but it has not provided any evidence, apart from Becker's lack of knowledge regarding the petroleum-additive market, to suggest that this is the case. We are not aware of any authority, nor has Polar Holding provided us with one, that holds that a secured party's knowledge of a particular industry bears any relationship to its ability to foreclose without warning on a security interest or to the sale of the collateral to someone who has such particularized knowledge.

In reality, nothing prevented Affiliated from foreclosing. The security agreement allowed Affiliated to foreclose at any time without providing notice to Polar Holding, and the escrow account streamlined the process for Affiliated to acquire the intellectual property. Under these circumstances, the district court correctly determined that it was merely a matter of time until the foreclosure took place. Thus, the only remaining question is whether the actual timing of the foreclosure made a difference, or whether Polar Holding's fortunes would have changed had foreclosure occurred later than it did. While Socia's conduct arguably caused the foreclosure to occur sooner than it otherwise might have, Polar Holding still has not presented evidence to suggest that it would have been able to pay off its debt to Affiliated had Affiliated further delayed foreclosing. As the company acknowledged in its form 10-KSB filed with the Securities and Exchange Commission in 2004, "[t]here [is] no assurance that we will be in a position to pay our obligations to the employees and advisors under this agreement and free our assets of the contingent lien in the near future." R. 149-4, Form 10-KSB Polar Holding at 8,

PageID # 2886. As this admission suggests, any claim that Polar Holding would have avoided foreclosure at a later date is pure speculation.

Nonetheless, at several points in its brief, Polar Holding appears to suggest that it would have somehow been able to pay off the loan and repeatedly asserts that the defendants have conceded the intellectual property's potential value. For example, at one point, Hill indicated that the intellectual property "could generate a billion dollars worth of annual revenue from the trucking industry." Appellant Reply Br. at 9. But the context in which this assertion arose is telling. Hill claimed that such sales were *theoretically* possible, but he went on to clarify that "[u]nder [Nelson's] leadership and direction, the company ha[d] gone through millions of dollars of investment funds with *no market position attained* . . . [The company needs] help on all fronts in formulating a 'turn around' plan . . . ." R. 153-6, Hill Letter at 5, PageID # 3291 (emphasis added). Far from corroborating Polar Holding's unsupported claim that it was on the verge of generating substantial sales to pay back its loan to Affiliated, Hill's letter compels the opposite conclusion.[9] The company was in dire straits.

Polar Holding's second piece of evidence, which purportedly demonstrates the company's ability to generate substantial sales, also undercuts its position. Polar Holding notes that at one point it had an "*anticipated* 10 million barrel order" from a trucking company. Appellant Br. at 9, n.5 (emphasis added). The word "anticipated" says it all. As the materials manager who made the statement explained, "[the 10 million] sounded like it was a sales

---

[9] In a similar vein, Polar Holding also alleges that the defendants have conceded "the forty million dollar annual forecast of purchases of [the fuel additive] by Total Fina Elf." Appellant Reply Br. at 9. In fact, Hill's letter says nothing of the sort. There is no mention of a *finalized* forty-million-dollar deal, let alone a forecast of annual sales in that amount. At best, the letter speculates that some deals were possible at one point in time, but then indicates that all the deals were disrupted or never finalized because of mismanagement. As Hill put it, all of the dealings, even the possible one with Total Fina Elf, "are in the *past tense*." R. 153-6, Hill Letter at 2, PageID # 3292 (emphasis added).

pitch . . . . All of the salespeople give you a number to get you excited . . . . Whether that was true numbers again, I don't have any recollection of seeing any contracts between Polar or [the purchaser]." R. 153-4, Urch Dep. at 4, PageID # 3723. We are not persuaded by such a "sales pitch." An "anticipated" order, which even the declarant admits is likely inflated and speculative, is of little value in demonstrating Polar Holding's financial prospects. It therefore fails to demonstrate that the timing of the foreclosure had any effect on Polar Holding's fate.

Far more telling is the Form 10-KSB, which Polar Holding filed with the Securities and Exchange Commission. There, Polar Holding admitted:

> Polar has not received a purchase order from any retail gasoline supplier, and there can be no assurance that we will receive any purchase orders from any of these companies in the future. If we are unable to obtain purchase orders from our potential customers and begin producing net income, we may not be able to continue as a going concern. Throughout our history of operation, *we have never produced net income and there can be no assurance that we will produce net income in the future*.

R. 149-4, Form 10-KSB Polar Holding at 8, PageID # 2886 (emphasis added). Although this report dates back to 2004, Polar Holding offers no evidence of any improvement in PMC's financial health after 2004. We are thus left with the fact of a deeply indebted corporation on the verge of bankruptcy with no apparent means to finance its defaulted loans. Accordingly, a reasonable jury could reach only one conclusion: Affiliated would have foreclosed and acquired the intellectual property held as collateral regardless of Socia's actions. In other words, the record shows that the proximate cause of Polar Holding's loss was its weak performance as a company and its inability to repay Affiliated's loan, not Socia's misconduct.

We have repeatedly noted that a defendant cannot defeat a "properly supported motion for summary judgment . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could,

disbelieve the defendant's denial." *Anderson*, 477 U.S. at 256. Polar Holding has not satisfied its burden. Even drawing all reasonable inferences in the non-moving party's favor, Polar Holding has not provided concrete and "substantial evidence from which a jury [could] conclude that more likely than not, but for the defendant[s'] conduct, the plaintiff's injuries would not have occurred." *Skinner*, 516 N.W.2d at 480. We therefore affirm the district court's grant of summary judgment on this asserted breach.

2. ***Breach of Fiduciary Duty by Suggesting Additional Intellectual Property Be Transferred into the Escrow Account***

Polar Holding next alleges that Socia breached his fiduciary duty by suggesting that Affiliated request additional intellectual property be placed in the escrow account. The district court assumed that this conduct constituted a breach of Socia's fiduciary duty, because he was still a member of Polar Holding's board when he made the recommendation, and focused its analysis again on the issue of proximate cause. We do the same, also finding proximate cause to be the dispositive issue.

Just as in the previous claim, Polar Holding has provided no evidence to indicate that the transfer of additional intellectual property into the escrow account proximately caused harm to the company. Instead, Polar Holding broadly contends that its stock was rendered worthless by Socia's suggestion that Affiliated foreclose and by the transfer of the additional property. This is the same as the first allegation of breach of fiduciary duty. Polar Holding has not alleged a unique or separate harm that resulted solely from the transfer of the additional collateral. Put differently, Polar Holding has not alleged a harm that was independent of that caused by the general foreclosure. But as discussed in the prior section, foreclosure and the resultant loss of Polar Holding's intellectual property and source of income were a foregone conclusion. Consequently, because we have already determined that Polar Holding has not provided evidence that it was proximately harmed by Socia's suggestion that Affiliated foreclose, we also must conclude that Polar Holding has not demonstrated that it was proximately harmed by the transfer of additional intellectual property into the escrow account.[10]

---

[10] Even if this were not the case, under the express terms of the security agreement and the loan extensions, it is clear that Affiliated had the right to all of PMC's patents and its pending patent applications. Whether Petroleum Enhancer acquired the intellectual property from the escrow account or from the final foreclosure proceeding, the end result was again the same. PMC was

In response, Polar Holding presents two generalized counterarguments. First, Polar Holding contends that Socia should have been prevented as a matter of law from arguing that he did not proximately cause Polar Holding's injuries because he did not disclose his conduct or business plan to Polar Holding. There is one problem with this argument: Socia did not have an obligation to disclose his possible future competition. As previously discussed, *Production Finishing Corp. v. Shields* prohibits the diversion of corporate opportunities. 405 N.W.2d at 175. It does not impose a strict requirement that fiduciaries have to file a competing business plan with their principal. We thus reject Polar Holding's contention that Socia had a duty of full disclosure that prohibits him from presenting a proximate-cause defense.

Second, Polar Holding argues that Nelson would not have placed additional property in escrow had he known that Affiliated intended to foreclose. Again, there is no evidence that this caused harm to Polar Holding, nor that this would have altered the outcome. All of PMC's intellectual property was sold as a single unit at the foreclosure sale, and PMC was required by contract to provide Affiliated with all of the collateral. Furthermore, it should be recalled that, under the loan-extension agreements, Affiliated had no obligation to provide PMC with notice of foreclosure. As Polar Holding has again not presented "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred," *Skinner*, 516 N.W.2d at 479, we affirm the district court's grant of summary judgment on this asserted breach.

---

contractually obliged to provide Affiliated with all of the collateral in the event of default, and therefore no harm was caused by the placement of additional intellectual property in escrow.

### 3. *Breach of Fiduciary Duty by Forming Petroleum Enhancer*

Polar Holding's final contention is that Socia breached his fiduciary duty by forming Petroleum Enhancer. Under Michigan law, a director "may compete against a former employer in the same business and that they do not violate their duty of loyalty when they merely organize a corporation during their employment to carry on a rival business after the expiration of employment." *Quality Mfg., Inc., v. Mann*, No. 286491, 2009 WL 4827068, *4–5 (Mich. Ct. App. Dec. 15, 2009) (internal citation and quotation marks omitted). The court of appeals further clarified, citing the Restatement 2d Agency, § 293:

> *Preparation for competition after termination of agency.* After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, *before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.*

*Id.* (quoting Restatement 2d Agency, § 293) (emphasis added).

As the district court correctly noted, all of the prerequisites identified in *Quality Manufacturing* are satisfied here. First, there was no contractual restriction on Socia's right to form a competing business. Polar Holding has not identified a non-compete agreement. Second, and as discussed previously, Socia was not obliged to reveal his intent to form a competing company. Third, based upon PMC's Securities and Exchange filings, it was public knowledge that PMC was in default and at risk of foreclosure. Therefore, it cannot be said that Socia took advantage of confidential information. Finally, Socia resigned from Polar Holding's board *before* Affiliated assigned its interest in PMC's collateral to Petroleum Enhancer.

Taken together, it is clear that Socia did not breach his fiduciary duty by forming Petroleum Enhancer and later competing with Polar Holding after his resignation. But even were

this not the case, as extensively discussed in prior sections, Polar Holding has failed to demonstrate that, but for Socia's conduct, it could have avoided Affiliated's eventual foreclosure. For all of these reasons, we reject Polar Holding's claim that Socia breached his fiduciary duty by forming a competing company, and affirm the district court's grant of summary judgment on this asserted breach.

### 4. *Conclusion on Breach-of-Fiduciary-Duty Claim*

For the aforementioned reasons, we **AFFIRM** the district court's grant of summary judgment on the breach-of-fiduciary-duty claim.

## C. **Tortious Interference**

Polar Holding next contends that the defendants tortiously interfered with its business relationship with PMC. In order to prevail on a tortious-interference claim, there must exist "a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) (internal citation and quotation marks omitted).

In the present case, a valid business relationship clearly existed. PMC was a subsidiary wholly owned by its parent corporation, Polar Holding. Similarly, there can be no question that Socia, as a member of the Polar Holding board, was aware of this relationship. The only questions that remain are whether Socia intentionally interfered with Polar Holding and PMC's business relationship, and whether this caused damage to Polar Holding.

The district court in its ruling focused on the intentionality of the interference, correctly emphasizing that a party must have a "motive to interfere with the business relations." *Arim v.*

*Gen. Motors Corp.*, 520 N.W.2d 695, 703 (Mich. Ct. App. 1994). After concluding that Polar Holding had not presented evidence that revealed an affirmative intent to interfere with PMC and Polar Holding's business relationship, the district court rejected the claim for tortious interference. We agree.

In its brief, Polar Holding focuses almost exclusively on Socia's breach of fiduciary duty and the damage allegedly caused by Socia's conduct, identifying in particular the disruption of monetary payments, the loss of intellectual property, and the eventual bankruptcy of PMC. With regard to the question of intent, however, Polar Holding's argument is confusing and woefully insufficient.

Polar Holding first argues that the question of motive and intent "should not be decided at the Summary Judgment stage." Appellant Br. at 34. Although this court has previously suggested that "summary judgment is generally not well suited for cases in which motive and intent are at issue," *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000), we have not indicated, contrary to Polar Holding's intimation, that courts cannot decide such issues. *See Street v. JC Bradford & Co., et al.*, 886 F.3d 1472, 1479 (6th Cir. 1989) ("Cases involving state of mind issues are not necessarily inappropriate for summary judgment."). Moreover, even if some cases are not well-suited for an analysis of intent at the summary judgment stage, here the record is sufficiently developed.

Polar Holding next asserts that "Socia knew that [PMC] was paying bills owed by [Polar Holding] based upon the product which was sold due to the fact that [PMC] had the intellectual property and patents." Appellant Br. at 34. Polar Holding appears to be alleging that Socia knew that his conduct would interfere with the transfer of funds between Polar Holding and PMC. As an initial matter, Polar Holding alleges only that Socia *knew* about the payment

system, not that Socia intended to disrupt the payments, nor that Socia intended to affect Polar Holding's relationship with PMC. Moreover, as the district court pointed out, Polar Holding appears to contradict its statement by later asserting, "[Polar Holding] has been providing its subsidiary with funds obtained through the sale of stock which was being used by the subsidiary to pay off debts and for the purposes of maintaining its operation." *Id.* at 34–35. The record thus does not establish the final relationship between PMC and Polar Holding with regard to who was providing funds to whom, or that Socia formed Petroleum Enhancer with the intent to both interfere with PMC and Polar Holding's relationship and to acquire PMC's intellectual property.

Apart from these unclear and inconsistent allegations, Polar Holding's remaining assertions that Socia's conduct was "improper and thus actionable" are overly conclusory. Appellant Br. at 33. Polar Holding has failed to demonstrate that Socia's conduct was for the particular "purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984). Under these circumstances, there is insufficient evidence for a reasonable jury to determine that Socia intended to interfere with Polar Holding and PMC's relationship. Accordingly, we **AFFIRM** the district court's grant of summary judgment on the claim of tortious interference.

### D. **Civil Conspiracy**

Polar Holding's final claim is one for civil conspiracy, particularly that Becker, Hill, and Socia conspired to breach Socia's fiduciary duty to Polar Holding. The central elements of a civil conspiracy are "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means." *Mays v. Three Rivers Rubber Corp.*, 352 N.W.2d 339, 341 (Mich. Ct. App. 1984). Under Michigan law, "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate

actionable tort." *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (1986). Accordingly, when a plaintiff's separate actionable tort theories fail, so too must the civil conspiracy claim.

This court previously determined that "there are only two possible independent torts upon which the conspiracy claim could be predicated: breach of fiduciary duty and tortious interference." *Petroleum Enhancer*, 690 F.3d at 769. Because we have concluded that summary judgment is appropriate on Polar Holding's breach-of-fiduciary-duty and tortious-interference claims, we likewise determine that Polar Holding's civil-conspiracy claim must also be dismissed.

We therefore **AFFIRM** the district court's denial of Polar Holding's claim for civil conspiracy.

### III. CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment on all claims.